**Karl H. KRAHL, Appellant,**

v.

**NINE MILE CREEK WATERSHED DISTRICT, Respondent, City of Eden Prairie (formerly the Village of Eden Prairie), Respondent.**

No. 48574.

Supreme Court of Minnesota.

Aug. 31, 1979.

---

Berg, Hacking & Berg and Gordon J. Berg, Larkin, Hoffman, Daly & Lindgren and James P. Larkin, Minneapolis, for appellant.

Popham, Haik, Schnobrich, Kaufman & Doty, Raymond A. Haik and Bruce D. Malkerson, Minneapolis, for Nine Mile Creek Watershed District.

Perbix, Harvey, Simons & Thorfinnson and Ross L. Thorfinnson, Hopkins, for City of Eden Prairie.

Heard before SHERAN, C. J., and SCOTT and MAXWELL, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

Plaintiff, Karl H. Krahl (Krahl), appeals from a judgment of the Hennepin County District Court entered on December 5, 1977, dismissing his declaratory judgment action against the Nine Mile Creek Watershed District (watershed district) and the City of Eden Prairie (city). He commenced that action in September 1973, seeking, *inter alia*, a court order to invalidate the watershed district's floodplain encroachment regulations, abatement of special assessments and general property taxes, and damages for an alleged condemnation of his property. The matter was tried to the court, and the dismissals were granted upon motions by the defendants at the conclusion of Krahl's case. We affirm.

This action concerns a tract of land located in the northwest quadrant of the intersection of Interstate 494 and Washington Avenue South (Old County Road 18) in the city of Eden Prairie. The property involved is 11.14 acres in gross area and rectangular in shape, measuring 400 feet from east to

west and 1284.2 feet from north to south. The south fork of Nine Mile Creek enters the property at its west line at a point about 425 feet north of the tract's southwest corner and flows southeasterly across the land, leaving the tract at a point about 225 feet north of the tract's southeast corner. Because of the creek, the southerly two-thirds of the tract is low land with marsh vegetation and the northerly one-third is high ground containing gravel.[1]

Krahl began negotiating to buy the land from Richard and Dorothy Fullerton in January 1969. He personally examined the land and became aware of the physical features referred to in the preceding paragraphs. On February 28, 1969, pursuant to an earnest money contract of January 21, 1969, Krahl entered into a contract for deed with the Fullertons to purchase the property for $70,000. Pursuant to the agreement, the Fullertons agreed to continue paying an outstanding balance due Hennepin Federal Savings and Loan Association on a contract for deed dated July 22, 1959, between those parties for the property, and Krahl agreed to pay all taxes and outstanding special assessments against the property payable in 1969 and in the future. Prior to purchasing the property Krahl instructed his attorney to prepare a legal title opinion for the tract. This opinion noted as an exception to the title opinion the existence of any ordinances governing development on the property and specifically advised Krahl of the existence of Nine Mile Creek on the property.

Krahl testified that he bought the land so that he could construct a repair building for use in his excavation business.[2] Thus, in early April 1970, he appeared before the city with a preliminary plan for the property's development. However, because Krahl's plan called for the filling of the low land area on his property, he was instructed to obtain a fill permit from the watershed district before the city would act upon his application. Prior to this, Krahl was not aware of the watershed district's existence.[3]

The Nine Mile Creek Watershed District was established in 1959 by the Minnesota Water Resources Board as a result of a petition filed by the Hennepin County Commissioners. As created, it comprises about 50 square miles in southern Hennepin County and covers portions of the cities of Edina, Bloomington, Eden Prairie, Hopkins, Minnetonka, and Richfield.

In 1961, the Minnesota Water Resources Board "prescribed" the Nine Mile Creek Watershed District Overall Plan pursuant to Minn. St. 112.46. This overall plan was later amended on January 30, 1962. From 1961 through 1970, the plan regulated encroachment into the floodplain of Nine Mile Creek. Specifically, the plan provided, in part, as follows:

"The flood zone elevations at various points along the creek are shown on the profile on page 19. No valuable improvements which can be damaged by water should be permitted below the indicated

1. Approximately 70,000 square feet of the 513,-248 square-foot tract is occupied by road, right-of-way, or creek. Washington Avenue, a public street and highway, occupies the easterly 33 feet of the tract for a total of 42,378.6 square feet of road area. In addition, a permanent 66-foot wide right-of-way over the high ground further reduces the usable area of the property by 26,400 square feet. And finally, the channel of Nine Mile Creek is 3 to 5 feet wide and 450 to 500 feet in length and thus occupies approximately 1350 to 2500 square feet in area.

2. The area had recently been rezoned to allow this type of use.

3. During his negotiations to purchase the property Krahl checked with the city of Eden Prairie to ascertain if the city restricted development near the creekbed. At trial, he testified

that the city manager informed him that the city's restrictions would allow filling with earth to a distance within 50 feet of either side of Nine Mile Creek and would allow construction of warehousing or light industrial buildings on the land so filled within 100 feet of either side of the creek. On cross-examination, however, Krahl admitted that never during negotiations *prior to the purchase of the property had he* asked anyone, including representatives of the city, what other municipal, county, watershed, state or federal rules, regulations or ordinances applied to filling the floodplain or to the construction of buildings on the property. Full investigation at that time would have revealed the existence of the watershed district, its overall plan, and rules and regulations.

elevation. Since the proposed storage basins and floodways are not yet constructed, it is imperative that we retain most of the natural marshes as they are our only means of flood protection. Accordingly, the net encroachment onto the flood plain must be restricted to approximately 20% of the distance between the flood zone elevation contour and the creek channel, except that filling will be permitted around the Marsh Lake, Mt. Normandale Lake and Mud Lake detention sites outside the limits of the proposed lakes." [4]

To implement this encroachment limitation, the watershed district adopted regulations requiring the owners of property abutting the creek to submit preliminary development plans to the district and secure a permit before filling the floodplain. [5]

Pursuant to the city's instructions, on April 15, 1970, Krahl appeared before the watershed district's managers at a regularly scheduled public meeting and presented to them his preliminary plan (plan #1) for development of the property. At that time, Krahl was informed by the managers that those portions of his property having a sea level elevation of 834 feet or less were within the floodplain of the Nine Mile Creek Watershed District as established by its 1961 overall plan. As it appeared that his plan called for the development of a large area of floodplain property, the managers directed their engineers to review plan #1.

On May 20, 1970, Krahl reappeared before the managers of the watershed district and requested approval of plan #1. Specifically, this plan provided for three single-story buildings, each with base dimensions of 250 feet by 130 feet. One building was to be located south of the creek in the floodplain; a second was to be located immediately north of the creek in the floodplain. The sites for those two buildings were on land having an elevation of about 832 feet above sea level and both therefore were located within the floodplain as established by the watershed district in its 1961 overall plan. As shown on plan #1, the ground on which both buildings would be built would have to be first elevated by earth fill to an elevation of 836 feet above sea level, or 2 feet above the elevation of the floodplain. The third building on the plan was to be located on the northerly ⅛ of the property outside of the then existing floodplain.

At the May 20, 1970, meeting, the managers of the watershed district disapproved of Krahl's application to fill all of the floodplain on the grounds that his plan was not in accordance with the 1961 overall plan of the watershed district and that plan #1 showed the alteration of the Nine Mile Creek channel. Krahl was again informed that the floodplain level for his property was established at 834 feet above sea level by the 1961 overall plan and that the watershed district's 1961 overall plan limited the filling encroachment into the floodplain to 20 percent. He was also told that plan #1 greatly exceeded this requirement. In view of all this, Krahl withdrew plan #1 and

[4.] In 1973, the Nine Mile Creek Watershed District adopted a new overall plan which incorporated the 20-percent encroachment limitation of the 1961 plan. However, on February 11, 1975, the city of Eden Prairie, pursuant to Minn. St. c. 104, adopted its floodplain ordinances. Thus, in accordance with Minn. St. 112.43, subd. 1(17), floodplain encroachment is now controlled by city ordinance.

[5.] On February 19, 1963, the watershed district adopted rules and regulations which read, in part, as follows:

"NINE MILE CREEK WATERSHED DISTRICT RULES AND REGULATIONS

"Rule 1. All preliminary plats of property abutting on the Creek, its tributary streams and lakes and marshes within the District shall be submitted to the District engineer for examination and comments as to changes before preparation of the final plat. Subdivision plats of large and undeveloped non-abutting areas shall also be filed.

\* \* \* \* \* \*

"Rule 5. A written permit shall be secured before any change is made by a riparian owner in the bed, bank, or shores of lakes, streams and marshes in the District \* \* \*. The applicant shall file his application with the District engineer. When public waters are involved, he must also file an application with the Commissioners of Conservation."

informed the watershed district that he would submit a different plan.

On June 17, 1970, Krahl again appeared before the watershed district's managers and submitted a revised plan (plan #2) for filling of the floodplain. Plan #2 showed two buildings, both of which were to be located north of the creek. Again, however, Krahl was informed that his plan was objectionable because it necessitated an encroachment in excess of the allowable 20 percent into the floodplain. The managers of the watershed district informed Krahl that the floodplain area of his property amounted to 269,000 square feet and that plan #2 required an encroachment of 54,000 square feet, thus exceeding the 20% fill encroachment by 3 percent. The watershed district managers did, however, inform Krahl that they would approve his fill permit if he would reduce his encroachment to comply with the 20 percent requirement. In a letter from the watershed district engineer dated June 18, 1970, Krahl was specifically informed that he had permission to fill 20 percent of the floodplain property.

Krahl never reapplied for any other fill permit from the watershed district, nor did he ever fill 20 percent of the floodplain on the property even though he was granted permission by the watershed district to do so. Krahl never communicated again with the watershed district except for a phone call from his attorney to the attorney for the watershed district, which resulted in a letter to Krahl's attorney informing him that if Krahl had any revised development in mind for the property, he should apply to the watershed district. Some three years later, this action was commenced.

Although a great number of issues are presented by the briefs, several of them are wholly dispositive of this matter. Consequently, we need only determine:

(1) Whether the watershed district's denial of Krahl's application for a permit to fill in excess of 20 percent of his floodplain property constitutes a taking of his property for which just compensation must be paid; and

(2) Whether his claims against the city for abatement of special assessments and general property taxes can be brought in this action.

1. Krahl's principal claim in this matter is that the watershed district's floodplain encroachment limitation constitutes a taking of his property for which just compensation must be paid. The trial court interpreted the watershed district's charter as precluding it from regulating improvements by riparian landowners and consequently concluded that the district's *ultra vires* adoption of an encroachment regulation amounted to an illegal taking of Krahl's land. The lower court further concluded, however, that Krahl failed to prove that he suffered any damage as a consequence of the taking and accordingly granted the watershed district's motion for dismissal. For the reasons stated below, we hold that this claim was properly dismissed.

■ To begin with, however, we cannot agree that the watershed district lacked the authority to regulate floodplain encroachment by riparian landowners. The watershed district's charter specifically provided that "it shall have all authority, powers and duties provided by law." This is a broad grant of power. As we recognized in *Adelman v. Omischuk*, 271 Minn. 216, 220, 135 N.W.2d 670, 673 (1965), "[t]he board of managers has the powers necessary to deal with problems of water use." See, also, *City of North St. Paul v. Minnesota Water Resources Board*, 260 N.W.2d 584 (Minn. 1977); *Maple Leaf Investors, Inc. v. State of Washington, Department of Ecology*, 88 Wash.2d 726, 565 P.2d 1162 (1977).

Control and alleviation of damage from flooding are primary among the purposes of the Nine Mile Creek Watershed District. Indeed, it was the fear of flooding resulting from unregulated encroachment into the floodplain which provided the major stimulus for creation of the watershed district. Until the construction of permanent basins and floodways, retention of natural floodplain marshland represents the only effective means of flood control. Accordingly, we must necessarily conclude that the wa-

tershed district managers had at their disposal the requisite power to adopt the encroachment regulation and thus accomplish their primary purpose.[6]

 This determination does not, however, end our inquiry. Because, as we recognized in *Johnson v. City of Plymouth*, 263 N.W.2d 603, 605 (Minn.1978), "taking or damage * * * can arise out of any interference by the state with the ownership, possession, enjoyment, or value of private property," we must next determine whether the otherwise valid encroachment regulation constitutes a taking of Krahl's property for which just compensation must be paid. To resolve this question we must balance the harm posed to society by the unregulated use of Krahl's land against the impact of the regulation upon the usability of his land. See, generally, 5 Wm. Mitchell L.Rev. 165, 167–76 (1979); Kusler, Open Space Zoning: Valid Regulation or Invalid Taking, 57 Minn.L.Rev. 1 (1971). Applying this balancing test to the particular facts of this matter, we conclude that no taking has occurred here.

As mentioned previously, until the construction of storage bins and floodways, the natural marsh characteristics of the floodplain represent the district's only means of flood control. Thus, unregulated filling and development of the floodplains would increase the likelihood of flooding downstream of Krahl's property. Clearly, then, unrestricted filling of the floodplain poses a substantial threat to the public.

As respects the impact of the regulation upon the land in question, in *Czech v. City of Blaine*, 312 Minn. 535, 539, 253 N.W.2d 272, 274 (1977), we recently held that:

"* * * For there to be an unconstitutional taking a landowner must demonstrate that he has been deprived, through governmental action or inaction, of all

the reasonable uses of his land. *C. F. Lytle Co. v. Clark*, 491 F.2d 834, 838 (10 Cir. 1974); *County of Freeborn v. Claussen*, 295 Minn. 96, 203 N.W.2d 323 (1972); see, generally, Freeman, Give and Take: Distributing Local Environmental Control Through Land-Use Regulation, 60 Minn.L.Rev. 833."

See, also, *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 131, 98 S.Ct. 2646, 2663, 57 L.Ed.2d 631, 652, rehearing denied 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978). In the instant case, Krahl has not met his burden of showing that he can make no reasonable use of the land. Rather, the watershed district has persuasively argued that a number of reasonable uses remain for the land: for example, the district asserts that the land could be used agriculturally; to meet open-space requirements of the zoning code; as a density credit area; for golf driving ranges, parking lots, recreation uses, set-back areas; or for any other use which would not impede the flow of surface waters. Accordingly, Krahl's claim must fail.

Moreover, we note that the interference with Krahl's property was not physical, nor was it permanent. Testimony at trial revealed that the encroachment restrictions will be modified once permanent flood control devices are constructed. Further, this is not a case where a property owner is burdened with a restriction without receiving a reciprocal benefit in his favor. See, *Penn Central Transportation Co. v. City of New York, supra* (Justice Rehnquist dissenting). Rather, Krahl, a riparian landowner, stands to gain the most from effective flood control. As a final matter, it should be acknowledged that floodplain and wetland regulations such as these have generally been held not to constitute takings of private property by the other courts which

---

6. Minn. St. 112.43, subd. 1(17) (added by L. 1971, c. 662), now specifically provides, *inter alia*, that: "* * * In the protection and the control of the use and development of land in the flood plain and the greenbelt and open space areas of the district, the managers shall have a limited authority to adopt ordinances to control encroachments, the changing of land contours, the placement of fill and structures of

every type, to prevent the placement of encumbrances or obstructions and to require the landowner to remove such fill, structures, encumbrances, or other obstructions and to restore the previously existing land contours and vegetation." We read this as simply a delineation of the managers' broad grant of powers and not, as Krahl urges, the grant of a new power not existing prior to 1971.

have addressed the question. See, e. g., *Brecciaroli v. Connecticut Comm'r of Environmental Protection*, 168 Conn. 349, 362 A.2d 948 (1975); *Pope v. City of Atlanta*, 242 Ga. 331, 249 S.E.2d 16 (1978); *Sibson v. State*, 115 N.H. 124, 336 A.2d 239 (1975); *Maple Leaf Investors, Inc. v. State of Washington, Department of Ecology*, 88 Wash.2d 726, 565 P.2d 1162 (1977).

It must be emphasized that we are very concerned with governmental action which significantly interferes with an individual's use of his property. This court, therefore, in future cases will not hesitate to award a landholder damages where, contrary to the instant action, an unconstitutional taking is shown.

2. In his original complaint, Krahl pleaded various theories of recovery against the city. He claimed that the city had taken his property, that he was damaged by certain alleged representations of city employees, that the city had acted arbitrarily and capriciously, and that he was entitled to abatement and refund of certain taxes and assessments. At the conclusion of Krahl's case, the trial court granted the city's motion to dismiss all claims. On appeal, only the issues respecting abatement of general property taxes and refund and abatement of special assessments are raised.

■ Below, Krahl sought an order abating his general property taxes due in 1977 and thereafter. We have emphasized in prior cases, however, that such actions must be commenced pursuant to Minn. St. c. 278 and have consistently refused to hear such claims as part of a declaratory judgment action. *Fichtner v. Schiller*, 271 Minn. 263, 135 N.W.2d 877 (1965); *Land O'Lakes Dairy Co. v. Village of Sebeka*, 225 Minn. 540, 31 N.W.2d 660, cert. denied, 334 U.S. 844, 68 S.Ct. 1513, 92 L.Ed. 1768 (1948). As we stated in the *Land O'Lakes* case:

> "In order that there shall be no future confusion on this particular point of the law, we hold that in enacting M.S.A. c. 278 it was the intention of the legislature to provide an adequate, speedy, and simple remedy for any taxpayer to have the validity of his claim, defense, or objections determined by the district court in matters where the taxpayer claims that his real estate has been partially, unfairly, or unequally assessed, or that it has been assessed at a value greater than its real or actual value, * * *.
>
> * * * * * *
>
> "* * * We hold that, so far as the determination of tax matters referred to in § 278.01 on real estate is concerned, c. 278 provides the necessary requisites and that L. 1933, c. 286 (M.S.A. c. 555), known as the Uniform Declaratory Judgments Act, is not available to the dairy company as an alternative remedy." 225 Minn. 548, 31 N.W.2d 665.

Accordingly, the trial court's dismissal of this claim was proper.

■ Likewise, the trial court properly dismissed Krahl's request for an order abating special assessments levied against the property in 1968[7] and 1972.[8] Minn.St. 429.-081 provides a speedy and efficient means

---

7. On November 1, 1968, pursuant to resolution No. 245, the city confirmed an assessment for Levy No. 4593 against the property for sanitary sewer, water, storm sewer, regrading, blacktopping, and concrete curb and gutter for Washington Avenue in the amount of $58,-398.35. The assessment was payable in 10 annual installments of $5,839.84, plus interest on the principal balances at 6 percent per annum. Krahl agreed to assume these payments in his contract with the Fullertons.

8. On October 10, 1972, pursuant to resolution No. 581, the city confirmed an assessment for Levy No. 5627 against the property for trunk sewer and water in the amount of $13,026. This assessment was payable in 20 annual installments of $651.30, plus interest on the remaining principal balances at 6 percent per annum. Over five months after Special Assessment Levy No. 5627 was adopted Krahl served a notice of appeal on the city. On October 18, 1975, Hennepin County District Court dismissed the appeal because of Krahl's failure to comply with the appeal provisions of Minn. St. 429.081.

of resolving objections to special assessments. See, *Larson v. Freeborn County,* 267 Minn. 383, 126 N.W.2d 771 (1964). Consistent with our holding in *Land O'Lakes v. Village of Sebeka, supra,* the availability of those appeal procedures precludes Krahl from raising this claim as a part of this declaratory judgment action. We note that a 1978 amendment to § 429.081, effective for appeals filed after April 5, 1978, clarifies the legislature's intent that the statutory appeal procedures be the exclusive method of appeals from special assessments.

Affirmed.

TODD, J., took no part in the consideration or decision of this case.