WENSMANN REALTY, INC.,
et al., Appellants,

v.

CITY OF EAGAN, Respondent.

No. A05–1074.

Supreme Court of Minnesota.

July 12, 2007.

William Christopher Penwell, Siegel, Brill, Greupner, Duffy & Foster P.A., Minneapolis, MN, for Appellant.

George C. Hoff, Justin L. Templin, Hoff, Barry & Kozar, P.A., Eden Prairie, MN, John M. Baker, Greene Espel, P.L.L.P., Minneapolis, MN, for Respondent.

Joseph G. Springer, Laurie J. Miller, Fredrikson & Byron, P.A., Minneapolis, MN, for Builders Association of the Twin Cities and National Association of Industrial and Office Products.

Susan L. Naughton, League of Minnesota Cities, St. Paul, MN, for Amicus Curiae.

Timothy J. Dowling, Community Rights Counsel, Washington, D.C., for League of

Minnesota Cities and Community Rights Counsel, American Planning Association, and Minnesota Planning Association.

Bruce D. Malkerson, Howard A. Roston, Patrick B. Steinhoff, Malkerson Gilliland Martin LLP, Minneapolis, MN, for Minnesota Land Use Institute.

Peter K. Beck, Gray Plant Mooty, Minneapolis, MN, for Midwest Golf Course Owners Association.

## OPINION

GILDEA, Justice.

Appellant Wensmann Realty, Inc., entered into a purchase agreement with appellant Rahn Family LP for golf course property located in respondent City of Eagan. The purchase agreement was contingent on the city amending its comprehensive plan to permit residential development of the property. After the city denied the proposed comprehensive plan amendment, Wensmann and Rahn (collectively, the property owner) commenced an action against the city, alleging that the denial was arbitrary and capricious and constituted a taking of the property without just compensation. On cross-motions for summary judgment, the district court granted declaratory relief and alternatively a writ of mandamus to the property owner. The court of appeals reversed, concluding that the denial of the comprehensive plan amendment had rational bases and that the record did not support a taking. We conclude that the denial of the comprehensive plan amendment was not arbitrary or capricious and affirm on that issue, but we cannot decide the takings issue due to the presence of disputed fact issues. Therefore, we reverse the court of appeals' conclusion on the takings claim and remand to the district court for further proceedings.

This land use dispute concerns 120 acres in Eagan, which have been known since the 1960s as the Carriage Hills Golf Course, a privately-owned eighteen-hole golf course that was open to the public. When the golf course was established, the area surrounding the property was largely rural. Since then, residential development has taken place on each side of the property except the north side, where Yankee Doodle Road borders the property. Currently, the land surrounding the property to the west, south, and east is designated for residential use, ranging from low to high density development. A school is located on the north side of the property.

In 1996, the original owner of the golf course sold the property to Rahn for $3.6 million. At the time, the comprehensive plan designation for the property was "Public Facilities." Rahn bought the property shortly after the city denied a request to amend the comprehensive plan to permit residential development of the property. Rahn was aware of the city's action. Rahn had experience operating golf courses and intended to operate a golf course on the property. Rahn acknowledges that it had no intention at the time of purchase of selling the property for development purposes.

In 1999, Rahn obtained a loan in excess of $3 million to pay off the contract for deed on the property and to pay for capital improvements to the golf course. Rahn asserts that the cost of the capital improvements at Carriage Hills "totaled well in excess of $300,000." But approximately $500,000 of the loan was used for a different golf course owned by Rahn.

In 2000, Rahn and the city entered into an assessment agreement for sewer, water, and street improvements. The city assessed charges for three parcels of land, each representing a portion of the proper-

ty, but for two of the parcels, the parties agreed to defer payments "until subdivision or development." The parties agree that the only payments Rahn has made under the assessment agreement have been related to its operation of the golf course on the property. At around the same time the assessment agreement was signed, a city engineer told Rahn that provisions were being made for future street extensions near the golf course "to accommodate future development of the Carriage Hills property."

When the city updated its comprehensive plan in 2001, the three golf courses in the city, including Carriage Hills, were designated as "P" (Parks, Open Space and Recreation), a category that "provides areas for public and private parks, open space, and recreational facilities." According to the comprehensive plan, "[p]arks, trails, open space and natural areas, athletic complexes, ice arenas, and golf courses are examples of desired uses in this category." To achieve consistency with the comprehensive plan, the property was rezoned to "P" (Park), a zoning district "intended for public and private park uses and related facilities." The permitted uses in a park district include camping grounds, golf courses, parks, playgrounds, swimming pools, and tennis courts. The city has recognized Carriage Hills as a component of the city's parks and recreation system, which the city has described as a "public-private partnership."

Although the golf course initially was profitable for Rahn, an economic downturn and an overbuilding of golf courses in the region have led to a more competitive industry. Rahn claims that the golf course has incurred significant cumulative losses amounting to hundreds of thousands of dollars. The city contends, however, that when debt service on the 1999 loan is excluded, the golf course operated at a profit through 2002.

The continuing losses led Rahn to conclude that the property was no longer economically sustainable as a golf course.[1] Rahn agreed in 2003 to sell the property to Wensmann, a developer and builder of residential homes. The agreement was contingent on government authorities reclassifying and rezoning the property to permit residential development.

In May 2004, Wensmann applied for an amendment to the city's comprehensive plan to allow residential development of the property. The application requested a land use designation of "Low Density Residential." Wensmann's proposal contemplated 480 housing units consisting of a mix of single-family homes, twin homes, townhomes, and empty nest housing. The proposed development would preserve 40 to 45 acres of park and open green space.

In connection with the application, Wensmann presented the city with two feasibility studies of Carriage Hills prepared by golf course analysts McMurchie Golf Management, Inc., and Hughes & Company, Inc. The McMurchie analysis concluded that, as of July 2004, the property had a supportable purchase price of $967,000 as a golf course. The McMurchie analysis also concluded that the golf course would need a minimum of $516,000 in improvements to maintain operations. The Hughes analysis indicated that the golf course is "functionally obsolete and has significant physical deterioration." "Even if the course is improved over time," the Hughes analysis stated that "there is barely enough cash to upgrade and effectively no return to ownership for taking such a risk." The Hughes analysis concluded that "the financial feasibility of future op-

---

1. In 2001, Rahn offered to sell the property to the city, but the city declined.

eration as a golf course is seriously impaired."

Wensmann's proposed development has faced substantial citizen opposition. An advisory planning commission recommended that the city deny the application. And in August 2004, the city council unanimously declined to amend the comprehensive plan to permit residential development of the property.

In support of its decision, the city council made numerous findings and conclusions, including concerns about burdening an already overcrowded school system; disrupting neighborhoods in the area with a significant increase in traffic; balancing the amount of residential and other types of land use classifications within the city; and maintaining the integrity of the comprehensive plan. The city council also concluded that Wensmann "failed to produce sufficient evidence to indicate that the existing Comprehensive Guide Plan designation makes the Property not viable for use as a golf course."

After the city denied the application and sometime in the fall of 2004 (the record does not disclose when), a representative of Wensmann made a multi-million dollar oral offer to Rahn to purchase the property with no conditions attached regarding the success or failure of the legal action or Wensmann's ability to pursue residential development of the property.[2] Rahn turned down the offer, but closed Carriage Hills at the end of the 2004 golf season. The golf course has not reopened.

On September 1, 2004, Wensmann and Rahn entered into an option agreement, granting Wensmann the exclusive right to buy the property. The option expires in September 2007, and a provision in the agreement required Wensmann to commence litigation against the city to try to compel the city to grant the necessary permits and approvals to develop the property for residential use.

Wensmann and Rahn commenced this action in Dakota County District Court. They sought declaratory relief that the city's denial of Wensmann's application for a comprehensive plan amendment is "arbitrary, capricious and unreasonable and effects a regulatory taking of the Property without just compensation." In the alternative, they petitioned for a writ of mandamus directing that the city commence eminent domain proceedings. The complaint alleged violations of the United States and Minnesota Constitutions.

Based on the allegations of violation of federal law, the city removed the action to federal court. Pursuant to a stipulation between the parties, the federal court dismissed the federal claims without prejudice and remanded the remaining state claims to the Dakota County District Court. The federal claims have not been refiled. Thus, this action involves solely claims of violations of state law.

In 2005, the district court considered cross-motions for summary judgment and granted declaratory relief and alternatively a writ of mandamus in favor of the property owner. The district court concluded that the city's reasons for denying the comprehensive plan amendment "are legally insufficient and are not supported by the facts in the record." The district court also concluded that "[o]perating a golf course on the property is no longer a

---

**2.** The exact dollar amount of the offer is in the record but is part of material the district court ordered to be held confidential. Accordingly, we do not include it in this opinion. We do note, however, that the amount of the offer was millions of dollars less than the amount Wensmann agreed to pay for the property in the 2003 written purchase agreement. The purchase price amount was also sealed by the district court.

reasonable use" of the property, and "none of the conditional or permitted uses currently allowed under the City Code would be reasonable uses." According to the district court, "if the City wants the property to remain as exclusively open space or a community recreational opportunity, it must acquire the property through eminent domain." Therefore, the district court ordered the city to "immediately amend" the comprehensive plan to change the land use designation for the property to Low Density and submit the amendment to the Metropolitan Council for approval. If the city did not comply with the order within 30 days, the city would be required to commence eminent domain proceedings.

The court of appeals reversed the district court's decision. *Wensmann Realty, Inc. v. City of Eagan,* No. A05–1074, 2006 WL 1390278, at *1 (Minn.App. May 23, 2006). The court of appeals concluded that the city had rational bases for denying the comprehensive plan amendment, and the property owner had no basis for a takings claim. *Id.* at *2–4. We granted the property owner's petition for review on both the land use and takings issues.

■■■ On appeal from summary judgment, we determine whether there are any genuine issues of material fact and whether a party is entitled to judgment as a matter of law. *Christensen v. Milbank Ins. Co.,* 658 N.W.2d 580, 584 (Minn.2003). When the material facts are not in dispute, we review the lower court's application of the law de novo. *Leamington Co. v. Nonprofits' Ins. Ass'n,* 615 N.W.2d 349, 353 (Minn.2000). Because the district court granted summary judgment in favor of the property owner, we must view the evidence in the light most favorable to the city as the party against whom summary judgment was granted. *See Yang v. Voyagaire Houseboats, Inc.,* 701 N.W.2d 783,

788 (Minn.2005). We also draw all factual inferences in favor of the city. *See Meintsma v. Loram Maintenance of Way, Inc.,* 684 N.W.2d 434, 438 (Minn.2004).

**I.**

■■■ We turn first to the city's land use decision, and we review such decisions under a rational basis standard of review. *Mendota Golf, LLP v. City of Mendota Heights,* 708 N.W.2d 162, 179 (Minn.2006). A decision regarding a proposed amendment to a city's comprehensive plan is legislative in nature, *see id.,* and the decision will be upheld unless the party challenging the decision can establish that there was no rational basis for the decision, *Honn v. City of Coon Rapids,* 313 N.W.2d 409, 414–15 (Minn.1981). "[E]xcept in those rare cases in which the city's decision has no rational basis, 'it is the duty of the judiciary to exercise restraint and accord appropriate deference to civil authorities in the performance of their duties.'" *Swanson v. City of Bloomington,* 421 N.W.2d 307, 311 (Minn.1988) (quoting *Honn,* 313 N.W.2d at 417). Accordingly, our standard of review is very narrow. *See, e.g., Amcon Corp. v. City of Eagan,* 348 N.W.2d 66, 72 (Minn.1984). We review the record to determine if the reasons given by the city are legally sufficient and supported by a factual basis. *Mendota Golf,* 708 N.W.2d at 180; *see also State ex rel. Howard v. Village of Roseville,* 244 Minn. 343, 347, 70 N.W.2d 404, 407 (1955) ("Even where the reasonableness of a zoning ordinance is debatable, * * * it is not the function of the courts to interfere with the legislative discretion on such issues.").

■■■ We have observed that "a wide range of value judgments" are considered in the municipal planning process. *Honn,* 313 N.W.2d at 417. In this case, the city articulated several reasons for declining to amend the comprehensive plan, including

preservation of open and recreational space and reaffirmation of historical land use designations. We recently upheld these reasons as rational bases supporting a city's land use decision that declined to alter a historical land use designation for property. *See Mendota Golf,* 708 N.W.2d at 181–82. The property owner conceded at oral argument that these two reasons provide a rational basis for the city's decision here consistent with our analysis in *Mendota Golf.* We agree.

In addition, the city cited the disruption of surrounding neighborhoods due to increased traffic and burdens on the school system. The property owner does not contend that concerns about traffic and school overcrowding cannot be a rational basis to support a land use decision. Instead, the property owner argues that there is not factual support for these concerns in the record. We disagree. Our review of the record demonstrates factual support for the city's traffic and school population concerns.[3]

Based on our review of the record and given the highly deferential standard of review, we conclude that the property owner has failed to establish that the city lacked a rational basis for its decision to deny Wensmann's application or that the decision was not supported by an adequate factual basis.[4]

## II.

■ We turn next to the question of a taking. The property owner argues that even if the city's denial of the comprehensive plan amendment was supported by a rational basis, the denial nonetheless results in a regulatory taking under the Minnesota Constitution for which just compensation must be paid. Whether a governmental entity's action constitutes a taking is a question of law that we review de novo. *Alevizos v. Metro. Airports Comm'n,* 298 Minn. 471, 484, 216 N.W.2d 651, 660 (1974).

The Minnesota Constitution provides that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation." Minn. Const. art. I, § 13. The language of the Takings Clause in the Minnesota Constitution is similar to the Takings Clause in the U.S. Constitution. *Zeman v. City of Minneapolis,* 552 N.W.2d 548, 551–52 (Minn. 1996). We have therefore relied on cases interpreting the U.S. Constitution's Tak-

---

3. With regard to traffic, the city's planning report concluded that the proposed development could generate over 3,000 additional trips, much of it impacting traffic at Lexington Avenue and Yankee Doodle Road, located at the northwest corner of the property. Moreover, Wensmann and Rahn commissioned their own traffic study, which concluded that if 65% of the proposed site is developed according to Wensmann's plan, the increase in traffic will warrant a new traffic signal at Yankee Doodle Road and Wescott Woodlands, located at the northeast corner of the property. With regard to the school population, the city's planning report noted that the middle school and high school currently exceed capacity and are anticipated to do so for the next five years, and the estimated additional students from the proposed development would "add to the existing school capacity situation."

4. The property owner also cites "substantial change to the neighborhood" and asks us to hold that the city's decision was invalid under *Sun Oil Co. v. Village of New Hope,* 300 Minn. 326, 220 N.W.2d 256 (1974). As we noted in *Mendota Golf,* however, *Sun Oil* does not articulate a standard of judicial review different from the rational basis standard we apply here. 708 N.W.2d at 180 n. 11 (discussing *Sun Oil*). We did discuss in *Sun Oil* whether the village's decision left the property owner with any "reasonable use" for its property. 300 Minn. at 337, 220 N.W.2d at 263. We apply that same analysis in this case in connection with our examination of the takings question.

ings Clause in interpreting this clause in the Minnesota Constitution. *See, e.g., Zeman,* 552 N.W.2d at 552 (citing federal cases).[5]

■ The purpose of the Takings Clause "is to ensure that the government does not require 'some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Westling v. County of Mille Lacs,* 581 N.W.2d 815, 823 (Minn.1998) (quoting *Zeman,* 552 N.W.2d at 552). This is precisely what the property owner is arguing in this case—that the denial of the comprehensive plan amendment will preserve open space for the benefit of the entire community while forcing the property owner alone to bear the economic burden.

■ It is well established that the government need not directly appropriate or physically invade private property to effectuate a taking. *See Penn. Coal Co. v. Mahon,* 260 U.S. 393, 414–15, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *Westling,* 581 N.W.2d at 823. In limited circumstances, government regulation of property may result in a taking. The Supreme Court has observed that "government regulation—by definition—involves the adjustment of rights for the public good," and "[o]ften this adjustment curtails some potential for the use or economic exploitation of private property." *Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979). In the context of government regulation a taking may result when the government "goes 'too far' in its regulation, so as to unfairly diminish the value of the individual's property, thus causing the individual to bear the burden rightly borne by the pub-

lic." *Westling,* 581 N.W.2d at 823. But as the Supreme Court recently noted, "[t]he rub, of course, has been—and remains—how to discern how far is 'too far.'" *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 538, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005).

■ Determining where a regulation ends and a taking begins "calls as much for the exercise of judgment as for the application of logic." *Andrus,* 444 U.S. at 65, 100 S.Ct. 318. Because the concepts of fairness and justice that underlie the Takings Clause "are less than fully determinate," the Supreme Court has "eschewed any set formula for determining when justice and fairness require that economic injuries caused by public action be compensated by the government." *Palazzolo v. Rhode Island,* 533 U.S. 606, 633, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (internal quotation marks omitted). Consequently, "the determination of whether a taking has occurred is highly fact-specific, depending on the particular circumstances underlying each case." *Westling,* 581 N.W.2d at 823; *see also Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (describing takings analyses as "ad hoc, factual inquiries").

■ In *Penn Central,* the Supreme Court identified "several factors that have particular significance" in the takings analysis. 438 U.S. at 124, 98 S.Ct. 2646. "Primary among those factors are '[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.' In addition, the 'character of the govern-

---

**5.** We have observed, however, that the language of the Takings Clause of the Minnesota Constitution can be construed to provide broader protections than the Takings Clause of the U.S. Constitution. *See State by Hum-* *phrey v. Strom,* 493 N.W.2d 554, 558 (Minn. 1992). But the property owner does not contend that this case requires us to interpret the Minnesota Constitution more broadly than the U.S. Constitution.

mental action' * * * may be relevant in discerning whether a taking has occurred." *Lingle,* 544 U.S. at 538–39, 125 S.Ct. 2074 (quoting *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646). The *Penn Central* approach is flexible, with the factors often being balanced. *E.g., Johnson v. City of Minneapolis,* 667 N.W.2d 109, 114 (Minn.2003) (describing the *Penn Central* framework as a "balancing test"). But the primary focus of the inquiry is on "the severity of the burden that government imposes upon private property rights." *Lingle,* 544 U.S. at 539, 125 S.Ct. 2074.

■ We have used the *Penn Central* framework in other cases to analyze takings claims arising under the U.S. and Minnesota Constitutions. *See, e.g., Westling,* 581 N.W.2d at 823–24; *Zeman,* 552 N.W.2d at 552; *Pratt v. State Dep't of Natural Res.,* 309 N.W.2d 767, 774 (Minn. 1981); *State by Powderly v. Erickson,* 285 N.W.2d 84, 90 (Minn.1979); *Krahl v. Nine Mile Creek Watershed Dist.,* 283 N.W.2d

538, 543 (Minn.1979). *But see Johnson,* 667 N.W.2d at 115 (concluding that "even if appellants' takings claim under the United States Constitution fails under *Penn Central,* appellants are entitled to compensation under the Minnesota Constitution"). In this case, the property owner relies principally on the framework established in *Penn Central* to argue that a taking occurred, and the city does not contend that the *Penn Central* factors are not an appropriate framework in which to analyze the takings questions presented. Because the property owner is not asking us to interpret the Takings Clause in the Minnesota Constitution more broadly than the Takings Clause in the U.S. Constitution has been interpreted, we agree with the parties that the standards set forth in *Penn Central* provide the best analytic framework to determine whether the city's actions resulted in a regulatory taking under the Minnesota Constitution.[6] We turn now to this analysis.

6. The property owner also has suggested that the city's denial of the comprehensive plan amendment constitutes a categorical taking under *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). In *Lucas,* the Supreme Court stated that "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Id.* at 1019, 112 S.Ct. 2886. The focus on the deprivation of "all economically beneficial uses" of the property in categorical takings claims under *Lucas* is confusingly similar to the focus on the denial of "economically viable use[s]" of the property that often takes place in regulatory takings claims under *Penn Central. E.g., Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 485, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); *Penn Central,* 438 U.S. at 138 n. 36, 98 S.Ct. 2646. The Supreme Court has made clear, however, that in categorical takings claims, the deprivation of all economically beneficial uses means "a complete elimination of value." *Lucas,* 505 U.S. at 1019–20 n. 8, 112 S.Ct. 2886. In other

words, a property owner must demonstrate that a regulatory action resulted in "a 100% diminution in value." *Norman v. United States,* 63 Fed.Cl. 231, 252 (Fed.Cl.2004), aff'd, 429 F.3d 1081 (Fed.Cir.2005), cert. denied, —— U.S. ——, 126 S.Ct. 2288, 164 L.Ed.2d 813 (2006); *see also Tahoe–Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 330, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (explaining that "the categorical rule would not apply if the diminution in value were 95% instead of 100%" and anything less than a total loss "would require the kind of analysis applied in *Penn Central* "); *Johnson,* 667 N.W.2d at 114 (stating that for claims arising under the U.S. Constitution, "[a]nything less than a complete taking of property requires the balancing test set forth in *Penn Central* "); *Zeman,* 552 N.W.2d at 553 n. 4 ("The trial court correctly observed that, if an alternative use is available, even if it is not the best or most profitable use, the regulation has caused merely a decline in the property's value, not the denial of all economically beneficial use; as the trial court noted, a decline in value is insufficient to bring this case within the ambit of *Lu-*

*Economic Impact*

■ We look first at the economic impact of the city's denial of the comprehensive plan amendment. The inquiry under this factor "turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle,* 544 U.S. at 540, 125 S.Ct. 2074. Courts have employed "different methods of measuring economic impact, depending on the circumstances." *CCA Assocs. v. United States,* 75 Fed.Cl. 170, 195 (Fed.Cl.2007).[7]

The parties disagree about how to measure the economic impact in this case. The city argues that the economic impact should be measured by comparing the value of the property as a golf course before and after the denial of the comprehensive plan amendment. *See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) (explaining that courts should compare "the value that has been taken from the property with the value that remains in the property"). Because there is no evidence that the value of the property as a golf course has changed since the city denied the comprehensive plan amendment, the city argues that the denial had no economic impact on the property. The property owner, on the other hand, argues that the economic impact should be measured by comparing the value of the property as a golf course with the value of the property if residential development had been permitted. According to the property owner, that comparison will measure the actual impact of the decision on the property's value. We conclude that neither of these methods is appropriate in this case.

The city's proposed method is not well suited to measure the economic impact of the government's decision to maintain the status quo. We have recognized that such status quo decision-making can result in an unconstitutional taking. *Czech v. City of Blaine,* 312 Minn. 535, 536–39, 253 N.W.2d 272, 273–74 (1977). But under the city's proposed method, the government could effectively force a property owner to maintain an existing use of property forever by refusing to change the comprehensive plan designation, regardless of whether changed conditions have rendered the existing or permitted uses of the property obsolete and economically unviable. *See Penn Central,* 438 U.S. at 138 & n. 36, 98 S.Ct. 2646 (holding that there was no taking because the restrictions imposed by the city's landmarks law "permit reasonable beneficial use" of the Grand Central Terminal, but noting that even the city conceded that if the property owners "can demonstrate at some point in the future that * * * the Terminal ceases to be 'eco-

---

*cas."*). In this case, the financial analysis offered by the property owner demonstrates that the property's value has not been completely eliminated; rather, the McMurchie analysis concluded that the property had a value of close to $1 million as a golf course. Therefore, the denial of the comprehensive plan amendment does not constitute a categorical taking under *Lucas.*

**7.** The United States Court of Federal Claims has described three different methods that courts have used in measuring the economic impact of a regulatory action:

One method measures the value taken from the property by regulatory action against the overall initial value. A second measure looks to the claimant's ability to recoup its capital. The third method examines a claimant's return on equity under a given regulatory regime in comparison to the return on equity that would be received but for the alleged taking.

*CCA Assocs.,* 75 Fed.Cl. at 195 (citations omitted).

nomically viable,' " the owners "may obtain relief"); *Hernandez v. City of Lafayette,* 643 F.2d 1188, 1191, 1197 (5th Cir.1981) (recognizing that a refusal to rezone property may in limited circumstances deprive an owner of economic value in the property).

Similarly, the property owner's method is not appropriate because it presupposes a right that the property never enjoyed under the city's regulatory scheme. A taking does not result simply because the property owner has been deprived of the most profitable use of the property. *See Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979). If we measured the value of the property as if residential development had been permitted, whenever a city's zoning ordinance prevented a use of property that could be more productive or valuable than what is allowed, the property owner could try to assert a takings claim. *See Fla. Rock Indus., Inc. v. United States,* 791 F.2d 893, 901 (Fed.Cir.1986) (explaining that a regulation may "have some adverse effect on the market value" of property without resulting in a taking). But "[t]he takings clause was never intended to compensate property owners for property rights they never had." *Gove v. Zoning Bd. of Appeals,* 444 Mass. 754, 831 N.E.2d 865, 874 (2005)

We conclude that the most appropriate method in cases like this, where the government chooses to maintain an existing comprehensive plan designation, is to determine whether the city's decision leaves any reasonable, economically viable use of the property. A land use regulation that leaves no reasonable use of the property has an unduly severe impact on the legitimate interests of the property owner. We have applied this standard in other takings decisions involving zoning. *See, e.g., Hubbard Broad., Inc. v. City of Afton,*

323 N.W.2d 757, 766 (Minn.1982); *Krahl,* 283 N.W.2d at 543; *Czech,* 312 Minn. at 539, 253 N.W.2d at 274. A reasonable use standard—requiring that a land use regulation "afford an owner some reasonably beneficial and economically viable use of his land"—is also reflected in U.S. Supreme Court decisions, as well as "the vast majority of state court decisions." 1 Edward H. Ziegler, Jr., Arden H. Rathkopf & Daren A. Rathkopf, *Rathkopf's The Law of Zoning and Planning* § 6:22 (4th ed.) (citing cases); *cf. Penn Central,* 438 U.S. at 131, 98 S.Ct. 2646 (noting that previous decisions have resolved takings claims "by focusing on the uses the regulations permit").

On this record, however, we cannot determine whether the city's denial of the comprehensive plan amendment leaves any reasonable use of the property. To begin with, it is disputed whether a golf course continues to be an economically viable use of the property. Rahn has closed Carriage Hills, claiming that "it cannot be operated profitably." But the McMurchie analysis concluded that the property had a supportable purchase price of $967,000 as a golf course. In addition, the parties disagree about whether debt service should be factored into the golf course's profitability analysis. The property owner asserts that the golf course has not earned a profit since 1999, but the city argues that when debt service for the 1999 loan is excluded, Carriage Hills was profitable during every year of Rahn's ownership except 2003. The Hughes analysis notes that the golf course operation is losing money "after paying debt service." Although this is a close question, we conclude that genuine issues of material fact prevent us from resolving whether a golf course continues to be a reasonable use of

the property.[8]

Even if we accept the property owner's contention that a golf course is no longer a reasonable use of the property, we cannot determine on this record whether the denial of the comprehensive plan amendment leaves any other reasonable uses of the property. The property owner submitted affidavits wherein proffered expert witnesses opined that there was not a reasonable use left for the property other than residential development.[9] Other than the argument regarding use as a golf course, which we have discussed above, the city does not specifically dispute these opinions or argue that the other permitted and conditional uses of the property under the comprehensive plan are reasonable uses for the property. Rather, the city argues that the property retains substantial value as investment property. *See MacLeod v. County of Santa Clara*, 749 F.2d 541, 547 n. 7 (9th Cir.1984) (suggesting that "[h]olding property for investment purposes can be a 'use' of property" for purposes of deciding a takings claim). As evidence of the investment value of the property, the city cites Wensmann's multi-million dollar oral offer for the property, and argues that this offer demonstrates that the property is "anything but worthless."

If we were to accept the oral offer as the true value of the property with the land

use restrictions in place, not only can Rahn not show "serious financial loss," the figure represents a significant return on Rahn's investment in the property, and thus could support a finding that holding the property for its investment value is a reasonable use. *See Cienega Gardens v. United States*, 331 F.3d 1319, 1340 (Fed.Cir.2003) ("What has evolved in the case law is a threshold requirement that plaintiffs show 'serious financial loss' from the regulatory imposition in order to merit compensation."); *Forest Props., Inc. v. United States*, 177 F.3d 1360, 1367 (Fed.Cir.1999) (stating that property owner's takings claim was undermined by the fact that the property's value had almost tripled since the purchase, despite the challenged regulatory restraint). For example, in a case where wetlands property could no longer be used for mining limestone—the sole previous use by the property owner—the United States Court of Appeals for the Federal Circuit determined that if a "solid and adequate fair market value" existed for the property, "that would be a sufficient remaining use of the property to forestall a determination that a taking had occurred." *Fla. Rock*, 791 F.2d at 903. The Federal Circuit explained that "economically viable use" does not necessarily mean *"immediately* viable use" if there is a willing buyer prepared to forgo instant

---

**8.** In the summary judgment order, the district court concluded that "rezoning the subject property LD—Low Density, is the *most reasonable* zoning classification for the property." (Emphasis added.) Although we are uncertain whether the district court applied this analysis to the city's land use decision or the takings analysis, the correct test in the takings context is not whether the city *allows the most reasonable use* of the property, but whether there is *any reasonable use left. See Almquist v. Town of Marshan*, 308 Minn. 52, 69, 245 N.W.2d 819, 828 (1976) ("It is too fundamental for citation of authorities that rezoning, which is otherwise valid, does not give rise to an action for damages because the

land in question may be more valuable for some other purpose.").

**9.** The city argues that these affidavits are not admissible because they were not before the city council when it denied Wensmann's application. But we are not considering the affidavits in our review of the city's land use decision. The affidavits were before the district court on summary judgment and therefore are properly part of the record before us in connection with our review of the takings question. *See* Minn. R. Civ. P. 56.03 (describing record on summary judgment).

income in hope of a long-term gain, such as a far-seeing investor willing to bet that the regulatory restraints would some day be lifted. *Id.* at 901–03.

The district court in this case refused to consider the "speculative value" of the property in view of the city's anticipated approval of residential development in the future. But, as the Federal Circuit noted in *Florida Rock*, speculative value or uses are to be distinguished from "a relevant market made up of investors who are real but are speculating in whole or major part." *Id.* at 903. The Federal Circuit concluded there that the Claims Court had erred by not considering the possibility that the property owner "could have disposed of the property and mitigated the severity of the regulatory action." *Id.* The same inquiry needs to be conducted in this case.

The property owner acknowledges that the oral offer was made. The parties dispute, however, the weight the offer should be given.[10] The city argues that the offer represents "the amount that a willing buyer would pay for the property *following* the City's denial of the reguiding application," suggesting that the offer reflects the actual value of the property subject to the current comprehensive plan designation. But the property owner argues that it should be ignored because it is inconsistent with the terms of the parties' written agreement. According to the property owner, the true value of the property, in the absence of success in this litigation, is closer to $1 million taking into account the land use restrictions.

The district court did not address the oral offer in its analysis of the takings claim, and the record is not fully developed on this point. The district court simply noted that the city had not challenged the property owner's evidence that "none of the conditional or permitted uses currently allowed under the City Code would be reasonable uses." Accordingly, we cannot determine the value of the property as investment property and thus whether holding or selling the property for investment purposes is a reasonable use.

In sum, we cannot decide on this record whether the golf course remains a reasonable use of the property and whether there is another reasonable use under the current comprehensive plan designation. Therefore, we are unable to determine the economic impact of the denial of the comprehensive plan amendment.

*Investment–Backed Expectations*

The second *Penn Central* factor requires that we examine whether the city's denial of the comprehensive plan amendment has interfered with Rahn's "distinct investment-backed expectations." *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646. In examining a property owner's investment-backed expectations, the existing and permitted uses of the property when the land was acquired generally constitute the "primary expectation" of the landowner regarding the property. *Id.* at 136, 98 S.Ct. 2646; *see generally* 1 Edward H. Ziegler, Jr., Arden H. Rathkopf & Daren A. Rathkopf, *Rathkopf's The Law of Zoning and Planning* § 6:28 (4th ed.) (noting that the analysis "may distinguish between 'legitimate' as opposed to 'specu-

---

**10.** The property owner argues that we should not give the oral offer any weight because the statute of frauds prohibits the enforcement of oral contracts for the sale of real property. *See* Minn.Stat. § 513.05 (2006). Here, evidence of the offer is not being used to prove

the existence of a contract, but only to show that an oral offer was made. The proper weight to be given to the oral offer is an issue that is best addressed by the district court in the first instance on remand.

lative' development expectations based on whether or not the regulation in question existed at the time the land was purchased by, or transferred to, the particular owner"). For example, in *Zeman*, we explained that an owner who had used his property as a rental dwelling for 20 years had "some investment-backed expectations in its use as such." 552 N.W.2d at 553.

In this case, when the property was acquired in 1996, Rahn had no expectation of using the property for anything other than a golf course and Rahn was aware that the city had recently refused to allow residential development of the property. Therefore, the city argues that Rahn had no reasonable investment-backed expectation regarding residential development.

■ The fact that residential development of the property was prohibited when Rahn purchased the property is relevant to determining the reasonableness of Rahn's expectations, but Rahn's awareness of the restrictions does not automatically defeat the takings claim. The Supreme Court made this clear in *Palazzolo*, explaining that there is no per se rule that prohibits a *Penn Central* takings claim by the "mere fact that title was acquired after the effective date of the state-imposed restriction," 533 U.S. at 630, 121 S.Ct. 2448; otherwise, "the postenactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable." *Id.* at 627, 121 S.Ct. 2448. Therefore, the court of appeals erred by suggesting that Rahn cannot assert a takings claim if it " 'knew at the time of purchase that the property was subject to a zoning restriction.' " *Wensmann*, 2006 WL 1390278, at *3 (quoting *Myron v. City of Plymouth*, 562 N.W.2d 21, 23–24 (Minn.

App.1997), *aff'd without opinion*, 581 N.W.2d 815 (Minn.1998)).[11]

Even though Rahn intended to use the subject property as a golf course at the time of purchase, the property owner asserts that Rahn's expectations subsequently changed when the golf course proved to be unprofitable. The property owner asserts that Rahn, like any other property owner, had a general expectation of making a reasonable rate of return on its investment. In addition, the property owner cites the assessment agreement with the city as supporting a reasonable expectation of developing the property. The property owner also stresses that permitting residential development of the property would be consistent with the residential nature of the surrounding property.

■ We conclude that the investment-backed expectations factor favors the city. Rahn had no expectation of using the property at the time of purchase for anything other than a golf course, and the purchase price reflected the significant restrictions imposed on the use of the property. Furthermore, any losses that Rahn incurred subsequent to the purchase were not the result of the city's actions, but the result of general market conditions. As the United States Court of Federal Claims has observed, "Generally, when an owner buys property with knowledge of restrictions upon the development of that property, he assumes the risk of any economic loss." *Atlas Enters. Ltd. P'ship v. United States*, 32 Fed.Cl. 704, 708 (Fed.Cl.1995); *see also Taub v. City of Deer Park*, 882 S.W.2d 824, 826 (Tex.1994) ("The takings clause * * * does not charge the government with guaranteeing the profitability of

**11.** To the extent that *Myron* could be read to require the automatic rejection of a takings claim where the property owner knew at the time of purchase that the property was subject to a zoning restriction, it is overruled.

every piece of land subject to its authority.").

Rahn may have expected to earn a reasonable rate of return on its investment, but the *Penn Central* inquiry focuses on *distinct* investment-backed expectations. 438 U.S. at 124, 98 S.Ct. 2646. In other words, the property owner must actually have invested money in connection with its reasonable expectations regarding the proposed use of the property. Merely having expectations that the property might someday be developed as residential property without taking investment action on such expectations is not relevant to the *Penn Central* analysis, even if the expectations are reasonable. In this case, although the city did give Rahn some indications that residential development would be allowed at some point in the future and Rahn's expectations in that regard may therefore have been reasonable, Rahn is unable to demonstrate that it made any specific investment in the property with the expectation that the city would support such development. For example, Rahn concedes that it did not make any payments under the assessment agreement other than what was required for operation of the golf course. The investment-backed expectation factor therefore favors the city.

*Character of the Governmental Action*

The last *Penn Central* factor focuses on the character of the government action.[12] For years, courts looked at whether a zoning ordinance substantially advanced "legitimate state interests" in determining whether a taking occurred. *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *see Lingle*, 544 U.S. at 540, 125 S.Ct. 2074 (noting that a number of the Court's "takings precedents have recited the 'substantially advances' formula minted in *Agins* "). But the Supreme Court recently clarified that the underlying validity of a regulation is more of a due process question and "is logically prior to and distinct from the question whether a regulation effects a taking." *Lingle*, 544 U.S. at 543, 125 S.Ct. 2074.

■■■ We believe that the appropriate focus of the character inquiry should be on "the *nature* rather than the merit of the governmental action." *Small Prop. Owners of San Francisco v. City & County of San Francisco*, 141 Cal.App.4th 1388, 47 Cal.Rptr.3d 121, 136 (2006). Although the relevant considerations may vary depending on the circumstances of the case, an important consideration involves whether the regulation is general in application or whether the burden of the regulation falls disproportionately on relatively few property owners. *See CCA Assocs.*, 75 Fed.Cl. at 188. In *Lingle*, the Court explained that any takings test should take into account the actual burden imposed on property rights and "*how that burden is allocated.*" 544 U.S. at 543, 125 S.Ct. 2074 (emphasis added). Considering the allocation of the burden also corresponds with the emphasis on fairness that has informed our takings jurisprudence. *See Zeman*, 552 N.W.2d at 552.[13] For exam-

---

12. The character factor has been described as "the most confused and confusing feature of regulatory takings doctrine." John D. Echeverria, *The "Character" Factor in Regulatory Takings Analysis*, SK081 ALI–ABA 143, 145 (2005).

13. In examining the character factor in *Zeman*, we emphasized the purpose of the regu-

lation, concluding that there was no taking where the city ordinance served "a public harm prevention purpose"—deterring criminal activity in residential neighborhoods—and the ordinance was likely to achieve that purpose. 552 N.W.2d at 554–55. We recognize that this type of focus on the purpose of the regulation in *Zeman* and other cases has been called into question by *Lingle*. Of course, a

ple, in *Johnson v. City of Minneapolis,* we concluded that acting in bad faith and specifically targeting certain properties constituted a taking under the Minnesota Constitution. 667 N.W.2d at 116.

The property owner in this case asserts that by refusing to allow development of the property, the city has placed an extreme burden on one property owner while benefiting the public as a whole with open space for which the city did not pay. While the city focuses on the fact that the restrictions on the property were designed in aid of a comprehensive plan, the property owner focuses on the limited uses allowed under the "Park, Open Space and Recreation" comprehensive plan designation. According to the property owner's land use expert, the language used in the city's comprehensive plan and zoning ordinance is typical of language used "to describe public parks and publicly-owned uses, not private business uses." Moreover, according to this expert, it is not typical for a city to exclude other commercial, industrial, or residential uses and identify park and recreation uses as the only uses allowed in zoning districts that govern privately owned land.

The city's "Park System Plans have consistently recognized Carriage Hills, a privately owned, open-to-the-public golf course, as a component of the community's parks and recreation system." According to the city, the "Park System Plans have always acknowledged the need for golf courses as part of the overall recreation system," and the 2001 comprehensive plan contemplates that the city may "acquire land, if feasible, for parks." Nonetheless, when Carriage Hills experienced financial difficulties, the city declined to buy the property from Rahn and has refused to

allow the property owner to pursue other uses of the property.

■ Under these circumstances, we conclude that the character factor favors the property owner. This is not a situation where numerous property owners are subject to the same kind of land use restrictions, and a single property owner is asking the city to allow a new, different use. Instead, it appears that only a few private property owners in the city are subject to the "Parks, Open Space and Recreation" land use designation. The land use designation is extremely restrictive, and seems aimed at things that have been considered governmental functions. *See, e.g.,* Minn.Stat. § 429.021, subd. 1(6) (2006) (granting the council of a municipality the power to "acquire, improve and equip parks, open space areas, playgrounds, and recreational facilities within or without the corporate limits"); Minn. Stat. §§ 473.301–473.351 (2006) (addressing the need to preserve, protect, and develop recreational open space areas in the metropolitan area and authorizing the Metropolitan Council to make grants to acquire or develop such areas). Moreover, the property owner here merely is asking the city to allow the same type of residential development that the city has approved in the past for neighboring property owners. One of the reasons there is apparently a greater need for open space in the area of the property now is because the city has permitted other open space surrounding the golf course to be developed.

On these facts, we conclude that the burden of the comprehensive plan designation falls disproportionately on the property owner. The benefits of the open space provided by the golf course property are widely shared through the community, but

regulation still may be susceptible to a due process challenge if the regulation fails to

serve any legitimate governmental objective. That question is not before us.

the costs are focused solely on the property owner. We have trouble discerning any reciprocity of advantage resulting from the comprehensive plan designation for the property. *Cf. Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1570 (Fed.Cir. 1994) (noting that "[w]hen there is reciprocity of advantage, paradigmatically in a zoning case, then the claim that the Government has taken private property has little force" (internal citation omitted)). Therefore, we resolve the character factor against the city.[14]

*Balancing of Factors*

The final step of our takings analysis involves balancing the *Penn Central* factors. How the balance is struck will be driven by the facts of each particular case. In this case, having considered the economic impact of the denial of the comprehensive plan amendment, Rahn's investment-backed expectations, and the character of the government action, we conclude that the determinative factor in this case is whether the denial of the comprehensive plan amendment leaves the property owner with any reasonable use of the property. Even though Rahn cannot demonstrate that it had any reasonable investment-backed expectations in the residential development of the property, if a golf course is no longer an economically viable use of the property and the denial of the comprehensive plan amendment leaves no other reasonable use of the property, the city's refusal to change the comprehensive plan designation places a substantial, uncompensated burden on a single property owner. *See Lingle*, 544 U.S. at 539, 125 S.Ct. 2074 (noting that the "touchstone" of the regulatory takings analysis is "the severity of the burden that government imposes upon private property rights."). The citizens of Eagan clearly value the open space that the golf course provides, but if the prop-

**14.** In *McShane v. City of Faribault*, we observed that "not all zoning regulations are comparable." 292 N.W.2d 253, 257 (Minn. 1980). We distinguished between zoning regulations that arbitrate among competing land uses and zoning regulations that benefit a specific governmental enterprise. *Id.* at 257–59 (explaining that zoning regulations designed to effect a comprehensive plan generally involve "a reciprocal benefit and burden accruing to all landowners," while zoning regulations "for the sole benefit of a governmental enterprise" generally result in the burden falling on just a few individuals). *But see Pratt v. State Dep't of Natural Res.*, 309 N.W.2d 767, 773, 774 (Minn.1981) (noting that "the line between 'enterprise' and 'arbitration' is not always easy to discern" because of "[t]he presence of multiple purposes" for most regulations). Some commentators have viewed the *McShane* analysis as a distinct Minnesota approach to takings claims. *See, e.g.*, 25 James R. Dorsey, Bradley J. Gunn & Marc D. Simpson, *Minnesota Practice—Real Estate Law* § 10.37 (Eileen M. Roberts ed., 2007) (commenting on the multitude of "not entirely consistent" standards used by Minnesota courts for determining the existence of a regulatory taking); Arthur G. Boylan, Case Note, *Property—Losing Clarity in Loss of Access Cases: The Minnesota Supreme Court's Muddled Analysis in Dale Properties, LLC v. State*, 29 Wm. Mitchell L.Rev. 695, 708 (2002) (characterizing the "governmental enterprise" rule exemplified in *McShane* as "a different approach" to takings). In this case, the district court concluded that the city's denial of the comprehensive plan amendment, "in addition to being a taking under the *Penn Central* test, is also a taking under *McShane*." We do not view the *McShane* analysis as different from or inconsistent with the flexible approach to takings adopted by the Supreme Court in *Penn Central*. Any unfairly unequal distribution of the regulatory burden may be considered in appropriate cases under the character factor of the *Penn Central* approach and then balanced along with the other relevant factors. *See Pratt*, 309 N.W.2d at 774 (stating that "the principles enunciated in *McShane* for determining whether a taking has occurred must be applied with some flexibility" and noting that in *Penn Central* the Supreme Court "characterize[d] the inquiry as an essentially *ad hoc* examination of many significant factors").

erty owner is forced to leave the property undeveloped for the benefit of neighboring landowners without an opportunity to pursue a reasonable use of the property, the city is, in essence, asking the property owner to carry a burden that in all fairness should be borne by the entire community. *See Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).

Although the ultimate determination of whether the facts are sufficient to constitute a taking is a question of law, we cannot determine on this record, as discussed above, whether the city's denial of the comprehensive plan amendment leaves the property owner with any reasonable use of the property. Specifically, there is a factual dispute as to whether continued use of the property as a golf course is reasonable and whether holding or selling the property for investment purposes is a reasonable use. Therefore, we reverse the court of appeals' conclusion on the takings issue and remand to the district court for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

ANDERSON, PAUL H., J., and ANDERSON, G. BARRY, J., took no part in the consideration or decision of this case.