INTERSTATE COMPANIES,
INC., et al., Appellants,

v.

CITY OF BLOOMINGTON,
et al., Respondents.

No. A10–481.

Court of Appeals of Minnesota.

Nov. 9, 2010.

Lee A. Henderson, Hessian & McKasy, P.A., Minneapolis, MN, for appellants.

John M. Baker, Monte A. Mills, Greene, Espel, P.L.L.P., Minneapolis, MN; and Thaddeus R. Lightfoot, The Environmental Law Groups, Ltd., Minneapolis, MN, for respondents.

Considered and decided by KLAPHAKE, Presiding Judge; HALBROOKS, Judge; and HARTEN, Judge.*

## OPINION

KLAPHAKE, Judge.

Appellants challenge the district court's summary judgment in favor of respondents City of Bloomington and Metropolitan Airports Commission (MAC), on appellants' claims of a regulatory taking and inverse condemnation.

Because the district court failed to consider the more restrictive language of the Minnesota Constitution, which provides greater protection to a property owner than the United States Constitution, and because genuine issues of material fact preclude summary judgment, we reverse and remand for further proceedings.

## FACTS

Appellant Gordon D. Galarneau, Jr., is the sole owner of appellant Interstate Companies, Inc., and owns property located at 2501 American Boulevard East in Bloomington, which he leases to Interstate. Interstate uses this property for parts distribution, service repair, and sales of diesel engines; the building includes office space, a parts department, and a service shop. Galarneau paid $900,000 for this building in 1977. Interstate pays Galarneau about $62,000 a month for the lease.

Appellant Penny Sue Galarneau, Gordon's ex-wife, owns property located at 2601 American Boulevard East in Bloomington, which she leases to Interstate. Interstate has an engine service shop, a warehouse, and corporate headquarters in this building. Ms. Galarneau paid about $1.32 million for this building in 1994. Interstate pays Ms. Galarneau about $34,000 a month for the lease.

Respondent MAC owns and operates the Minneapolis–St. Paul International Airport in respondent city. In 2004, the Joint Airport Zoning Board adopted a new zoning ordinance because of a proposed new airport runway. The joint board consists of representatives from MAC and the city, as well as representatives from the surrounding counties and municipali-

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

ties. The ordinance establishes various safety zones radiating in a fan-like fashion from the runway. In the most restrictive zone, Safety Zone A, no structures are permitted, except those relative to airport operations or air navigation. Appellants' buildings are located in Safety Zone B, as established by the 2004 ordinance. Certain uses of property are prohibited in Safety Zone B and no building may be higher than approximately seven stories. The current uses of appellants' buildings are permitted. Before the new ordinance was adopted, appellants' buildings were in Safety Zone C, a less restrictive zone.

Because the Interstate buildings are only about 2,500 feet from the end of the runway, noise can be a problem. Employees describe the noise as very disruptive, although actual disruptions occur only two to three times each day.

Appellants' expert opined that there was a diminution in value of the combined properties before and after installation of the new runway, from $10.8 million to $5.035 million, although Interstate continued to be a profitable business; its profits increased after the new runway opened; and the Galarneaus collected rent from Interstate at historic levels or at greater than historic levels.

In 2002, appellants sought permission to build a hotel, but their application was denied because of a moratorium on such development and because they failed to perform all requirements for a conditional use permit. In 2005, the same plan was rejected because it violated the height restrictions of the new zoning ordinance. Appellants' property is close to the airport, the Mall of America, and the light rail line; neighboring properties that fall outside Safety Zone B of the zoning ordinance include both commercial and residential developments.

In September 2008, the district court granted partial summary judgment to respondents; this court rejected appellants' subsequent appeal from that summary judgment as untimely. Because this partial judgment was not successfully appealed, the current appeal addresses only the district court's January 12, 2010 order granting summary judgment on the remaining two claims, Count IV as to the city, and Count V as to MAC. Count IV alleges a regulatory taking by the city; Count V alleges inverse condemnation or deprivation of practical enjoyment by MAC.

## ISSUES

1. Did the district court err by granting summary judgment in favor of the city on the issue of whether the zoning amendment was a compensable regulatory taking of appellants' property?

2. Did the district court err by granting summary judgment in favor of MAC on the issue of whether MAC's use of property was an inverse condemnation or a taking through deprivation of practical enjoyment of appellants' property?

## ANALYSIS

*Standard of Review*

The district court shall grant summary judgment if, based on the record before the court, there are no genuine issues of material fact and either party is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03. We review the district court's decision to determine if there are any genuine issues of material fact and if the district court erred in its application of the law. *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.,* 644 N.W.2d 72, 77 (Minn.2002). "The district court's function on a motion for summary judgment is not to decide issues of fact, but solely to

determine whether genuine factual issues exist." *DLH, Inc. v. Russ,* 566 N.W.2d 60, 70 (Minn.1997).

### Regulatory Taking

■ Appellants challenge the district court's determination in favor of respondent city that the zoning amendment was not a regulatory taking of appellants' property. We review the question of whether a governmental action has resulted in a regulatory taking as a question of law. *Wensmann Realty, Inc. v. City of Eagan,* 734 N.W.2d 623, 631 (Minn.2007). The United States Constitution prohibits the taking of private property for public use without just compensation. U.S. Const. amend. V. The Minnesota Constitution states that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured." Minn. Const. art. I, § 13.

■ Claims of a regulatory taking under both the federal and state constitutions are analyzed using the three factors cited by the United States Supreme Court in *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659. These factors are (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Id.* "[T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 540, 125 S.Ct. 2074, 2082, 161 L.Ed.2d 876 (2005).

But although the *Penn Central* case provides the basic framework for analysis of a regulatory takings claim, it is a "flexible" approach. *Wensmann,* 734 N.W.2d at 633. We must also consider the language of the Minnesota Constitution, which has been construed to provide broader protection to property owners than the federal constitution. *State by Humphrey v. Strom,* 493 N.W.2d 554, 558 (Minn.1992). In *Strom,* the Minnesota Supreme Court concluded that "the clear intent of Minnesota law is to fully compensate its citizens for losses related to property rights incurred because of state actions." *Id.* (footnote omitted). Likewise, in *Johnson v. City of Minneapolis,* 667 N.W.2d 109 (Minn.2003), the supreme court stated that even if a takings claim fails under the United States Constitution based on a *Penn Central* analysis, the property owner may be entitled to compensation under the Minnesota Constitution, based on its more restrictive language. *Id.* at 115; *see also Wensmann,* 734 N.W.2d at 633 (declining to address issue of whether Minnesota Constitution is more restrictive because of property owner's failure to raise issue). Further, in a case decided after *Penn Central,* the Minnesota Supreme Court held that when a zoning ordinance benefits a specific public or governmental enterprise, a property owner who suffers a substantial and measurable decline in market value as a result of the regulations must be compensated. *McShane v. City of Faribault,* 292 N.W.2d 253, 258–59 (Minn.1980).

The *McShane* opinion informs the *Penn Central* standard. *McShane* dealt with airport zoning regulations and with a factual setting similar to the present matter. *Id.* at 255–56. There, the Minnesota Supreme Court acknowledged the principles of *Penn Central,* but distinguished between general zoning regulations (arbitration regulations) and regulations to benefit a specific public or governmental enterprise (enterprise regulations). *Id.* at 258. *McShane* provides the framework for analyzing the difference between the federal constitution's prohibition against the tak-

ing of private property for public use without just compensation and our state's constitution, which protects private property from being "taken, destroyed or *damaged* for public use without just compensation." Minn. Const. art. I, § 13 (emphasis added).

Whether under the federal or state constitution, a regulatory taking occurs when the government does not "directly appropriate or physically invade private property" but imposes some regulation that "curtails some potential for the use or economic exploitation of private property." *Wensmann,* 734 N.W.2d at 632. A taking results when the government "goes too far in its regulation, so as to unfairly diminish the value of the individual's property, thus causing the individual to bear the burden rightly born by the public." *Id.* (quoting *Westling v. County of Mille Lacs,* 581 N.W.2d 815, 823 (Minn. 1998)). Generally, the question of whether a government regulation is a compensable regulatory taking is answered by balancing various considerations, such as the *Penn Central* factors. *Id.*

The first *Penn Central* factor is the economic impact of the zoning ordinance on appellants' property interests. In *Wensmann,* the supreme court determined that the most appropriate method was to determine whether the governmental regulation left "any reasonable, economically viable use of the property." *Id.* at 635. Here, appellants can continue using the property in the same manner in which it has been used and the enterprise has been profitable. But *McShane* suggests that a slightly different standard is appropriate in the case of enterprise regulations; when a zoning ordinance is enacted solely for the benefit of governmental enterprise, the court should examine whether there is a "substantial and measurable decline in market value as a result of the regulations." 292 N.W.2d at 258–59. Appellants

offered an appraisal that showed an approximate 50% decline in value, but the district court rejected the appraisal as "deficient as a matter of law" for a number of reasons.

In the context of summary judgment, the district court must view the evidence in the light most favorable to the party opposing the motion and may not weigh the evidence. *DLH, Inc.,* 566 N.W.2d at 70. The district court's rejection of the market study is an improper weighing of evidence that should be determined by a factfinder.

Further, citing *Wensmann,* 734 N.W.2d at 635, the district court concluded that a taking does not occur "simply because the property owner has been deprived of the most profitable use of the property." This ignores the application of the Minnesota Constitution, which prohibits not only the taking of private property but also damage to private property for public use. Likewise, in *McShane,* the Minnesota Supreme Court held that "where land use regulations, such as the airport zoning ordinance here, are designed to benefit a specific public or governmental enterprise, there must be compensation to landowners whose property has suffered a substantial and measurable decline in market value as a result of the regulations." 292 N.W.2d at 258–59 (footnote omitted).

The second *Penn Central* factor considers the investment-backed expectations of the property owner. The "existing and permitted uses of the property when the land was acquired generally constitute the primary expectation of the landowner regarding the property," but this is not conclusive. *Wensmann,* 734 N.W.2d at 637 (quotation omitted). *Wensmann* suggests that more than just mere expectations are required; some specific investment action must be undertaken. *Id.* at

639. But appellants alleged that the area around the airport and along the light rail line, including neighboring property, was developing along the lines of high density residential and light industrial usage, and they reasonably expected to develop the property along these lines. In *McShane*, the landowners noted that highways had been built bisecting their largely agricultural land, leading them to believe that it could be sold for commercial use. 292 N.W.2d at 255. Although the district court found that appellants could not "presuppose a right that the property never enjoyed under the city's regulatory scheme" (citing *Wensmann*, 734 N.W.2d at 635), appellants had different reasonable expectations when their property was located within Safety Zone C before the zoning ordinance change, based on the development occurring on neighboring properties.

▉ Finally, the third *Penn Central* factor examines the character of the governmental action. This inquiry is focused on the "nature rather than the merit of the governmental action" and assesses whether the burden of the regulation falls on a relatively small group of property owners, who are asked to bear the burden for the benefit of others. *Wensmann*, 734 N.W.2d at 639 (quotation omitted); *see also McShane*, 292 N.W.2d at 258.

In *McShane*, the supreme court recognized the distinction in *Penn Central* between arbitration regulations, which benefit and apply to the general public, and enterprise regulations, which are enacted for the sole benefit of a governmental enterprise and which benefit the general public, but which burden only a few individual landowners. 292 N.W.2d at 258. The supreme court reasoned that when the burden falls on only a few landowners, the public in essence has acquired a free easement. *Id.* Here, the burden falls on appellants while neighboring properties on either side enjoy the benefit of enhanced transportation facilities.

Again, we are confronted with a summary judgment, in which the district court must view the facts in the light most favorable to appellants. Appellants raised fact issues about their reasonable investment expectations prior to enactment of the zoning ordinance and the development of the area around the airport. The market value study raises a fact question of whether appellants have suffered a "substantial and measurable decline in market value as a result of the regulation[ ]." *Id.* at 259. We conclude that genuine issues of material fact regarding whether the zoning regulation resulted in a substantial decline in market value remain, which precludes summary judgment.

*Inverse Condemnation*

▉ Appellants also challenge the district court's determination as to respondent MAC that MAC's use of appellants' property was not a taking through deprivation of practical enjoyment of their property. The supreme court set forth the standard for recovery for this type of inverse condemnation or an avigational easement in *Alevizos v. Metro. Airports Comm'n*, 298 Minn. 471, 216 N.W.2d 651 (1974) (*Alevizos I*). There, the supreme court stated that a property owner must show "a direct and substantial invasion of his property rights of such a magnitude he is deprived of the practical enjoyment of the property and that such invasion results in a definite and measurable diminution of the market value of the property." *Id.* at 487, 216 N.W.2d at 662 (footnote omitted). The supreme court noted that "the use and enjoyment of one's property without unduly irritating noise, vibrations, and gaseous fumes have arisen to the status of a property right for which a property owner may demand compensation when it is denied to

him by governmental activity[.]" *Id.* at 486, 216 N.W.2d at 662.

In the appeal after remand, the supreme court further clarified that a property owner must show a "definite and measurable diminution of the market value of the property" and that "ordinarily [this must] be substantiated by some kind of market studies or other documentation." *Alevizos v. Metro. Airports Comm'n,* 317 N.W.2d 352, 358–59 (Minn.1982) (*Alevizos II*). Further, the court stated, "Diminution in one's enjoyment and use of property is not the same as a diminution in market value; petitioners' error is in equating the two. An affront to one's sensibilities becomes legally cognizable here only when it becomes a servitude on the property itself, depressing its value on the market." *Id.* at 359.

■ Here, the district court concluded that appellants failed to "establish a direct and substantial invasion of their property rights of such a magnitude as to deprive them of the practical enjoyment of the [p]roperty." In reaching this conclusion, the district court dismissed accounts of noise, disrupted telephone calls and conversations, and employee fears of low-flying airplanes, concluding that these allegations did not interfere with the use and enjoyment of the property. But this conclusion rests on a resolution of factual issues, inappropriate to summary judgment. The district court may not weigh evidence or make findings of disputed facts. *Geist–Miller v. Mitchell,* 783 N.W.2d 197, 201 (Minn.App.2010).

The district court also concluded that appellants failed to provide evidence of the second *Alevizos* element, a definite and measurable loss in market value attributable to aircraft noise. The court noted that although appellants provided a market analysis to show a diminution in value, the report failed to identify the cause of the diminution, stating merely a downward adjustment was made based on a combination of "height and land use restrictions, jet noise and pollution, and safety risks." But this is exactly the question that was presented to the jury in *Alevizos v. Metro. Airports Comm'n,* 452 N.W.2d 492 (Minn. App.1990) (*Alevizos III*), *review denied* (Minn. May 11, 1990). Although the *Alevizos III* jury concluded that the property owners had failed to sustain their burden of proving a substantial diminution in market value, a factfinder must determine what caused the diminution in value. Here, appellants presented a market appraisal that showed a diminution in value tied to height and land use restrictions, noise, pollution, and safety risks. Taking the evidence in the light most favorable to appellants, the market appraisal creates a genuine issue of material fact.

## DECISION

■ The Minnesota Constitution provides broader protections to property owners than does the United States Constitution when property is taken, damaged, or destroyed for a public or governmental use. Courts must consider whether a property owner has suffered a substantial and measurable decline in property value because of a governmental regulation, and a private property owner may not be forced to a bear a burden for the benefit of the general public. Where the evidence is in controversy, the issue of whether a property owner has demonstrated a substantial diminution in value is a fact question for determination by the factfinder.

**Reversed and remanded.**