# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A23-0191

Fletcher Properties, Inc., et al.,
Appellants,

vs.

City of Minneapolis,
Respondent,

Poverty & Race Research Action Council, et al.,
Respondents,

HOME Line,
Respondent.

**Filed January 16, 2024**
**Affirmed**
**Frisch, Judge**

Hennepin County District Court
File No. 27-CV-17-9410

Tamara O'Neill Moreland, Inga K. Kingland, Larkin Hoffman Daly & Lindgren Ltd., Minneapolis, Minnesota (for appellants)

Kristyn Anderson, Minneapolis City Attorney, Kristin R. Sarff, Tracey N. Fussy, Assistant City Attorney, Minneapolis, Minnesota (for respondent City of Minneapolis)

John D. Cann, Housing Justice Center, St. Paul, Minnesota (for respondents Poverty & Race Research Action Council and Housing Justice Center)

Lawrence McDonough, Samuel Spaid, Daniel P. Suitor, HOME Line, Bloomington, Minnesota (for respondent HOME Line)

Considered and decided by Johnson, Presiding Judge; Frisch, Judge; and Kirk, Judge.*

**SYLLABUS**

1.    On its face, the Minneapolis city ordinance addressing housing discrimination based on public assistance does not appropriate private property or a landlord's right to exclude others from private property, and therefore does not constitute a per se physical taking in all applications.

2.    The Minneapolis city ordinance addressing housing discrimination based on public assistance is not preempted by the state's anti-discrimination statute because the ordinance does not conflict with the statute, and the statute does not occupy the field of housing discrimination based on public assistance.

**OPINION**

**FRISCH**, Judge

Appellant-landlords challenge the summary-judgment dismissal of their facial challenge to a city ordinance aimed at preventing housing discrimination based on public assistance. They argue that the district court erred as a matter of law in concluding that the ordinance did not amount to a taking and was not preempted by state law. They also argue that the district court abused its discretion in allowing amici participation at summary judgment. We affirm because appellants' challenge to the ordinance on its face fails as a

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

matter of law, the ordinance is not preempted by state law, and the district court did not abuse its discretion in allowing amici participation.

## FACTS

This is the second appeal in this matter. Appellants Fletcher Properties, Inc., et al. (collectively, Fletcher[1]) commenced this action against respondent City of Minneapolis to challenge a Minneapolis civil-rights ordinance that makes it an unlawful discriminatory practice for a landlord to refuse to let to a tenant based on a public-assistance program or otherwise use a tenant's participation in the Section 8 Housing Choice Voucher (HCV or voucher) program as a motivating factor for refusing that tenant. Minneapolis, Minn., Code of Ordinances (MCO) § 139.40(e)(1) (2017) (the ordinance). Specifically, Fletcher argues the ordinance amounts to a taking under the Minnesota Constitution and is preempted by state law.

### *Public Housing in Minneapolis*

The HCV program is a form of federally funded housing assistance that provides rent subsidies to eligible families. 42 U.S.C. § 1437f(o) (2018); 24 C.F.R. § 982.1(a) (2023). In Minneapolis, the Minneapolis Public Housing Authority (MPHA) administers the HCV program on behalf of the United States Department of Housing and Urban Development (HUD). As of 2018, the MPHA managed approximately 4,870 vouchers per year, and those vouchers benefited approximately 17,000 people. Most of the vouchers were tenant-based, meaning the HCV holder selects a unit, but about 700-800 of the

---

[1] Appellants are 54 persons and entities owning multi-tenant properties.

3

vouchers were project-based, meaning they were attached to a particular rental unit or building. 42 U.S.C. § 1437f(f)(6)-(7) (2018); 24 C.F.R. § 982.1(b) (2023) (defining "tenant-based" and "project-based" assistance).

In 2018, the then-director of HCV programs at the MPHA testified that the rate of vacant apartments for low-income households in Minneapolis was about 2-3%. The director also testified that the placement rate for HCV holders was high—almost 95%.

An HCV holder pays a portion of fair-market rent for a unit, usually about 30% of their income, and the remainder is subsidized and in turn paid directly to the landlord by HUD through the MPHA. The payment from the MPHA to the landlord is governed by a housing-assistance payment (HAP) contract that the landlord enters into with the MPHA. The HAP contract provides that the MPHA may change the amount it pays to a landlord during the contract term upon notice. The HAP contract also provides that a lease must include a tenancy addendum and establishes a default initial one-year lease term. Under the HAP contract, the MPHA must consent to the sale of the property and a new owner must agree to take the property subject to the HAP contract.

Prior to an HCV holder renting a unit, the MPHA conducts an inspection to determine if the unit meets HCV housing quality standards. An inspection must also be conducted for each renewal of the lease and failing a housing-quality-standards inspection can result in rent abatement.

Minneapolis rental property is also subject to city and state regulations that may require property inspections, including the Minneapolis housing code, the state fire code,

and the state building code.  And Minneapolis rental property is subject to other federal, state, and local regulation.

*The Ordinance*

The ordinance provides that it is an "unlawful discriminatory practice" for a landlord or any agent of a landlord to use "status with regard to a public assistance program, or any requirement of a public assistance program [as] a motivating factor" to "refuse to sell, rent or lease, or refuse to offer for sale, rental or lease; or to refuse to negotiate for the sale, rental, or lease of any real property."  MCO § 139.40(e)(1).

The ordinance provides that a landlord has an affirmative defense to a claim that the landlord's refusal to rent property constitutes an unlawful discriminatory practice if "the refusal, denial, or withholding is due to a requirement of a public assistance program and that requirement would impose an undue hardship" on the landlord.  *Id.*  "Undue hardship" is defined as:

> [A] situation requiring significant difficulty or expense when considered in light of a number of factors to be determined on a case-by-case basis.  These factors include, but are not limited to:
>
> (1) The nature and net cost of complying with any requirement of a public assistance program, taking into consideration existing property management processes;
>
> (2) The overall financial resources of the landlord, taking into consideration the overall size of the business with respect to the number of its employees, and the number, type, and location of its housing stock; and
>
> (3) The impact of complying with any requirement of a public assistance program upon the business and dwelling.

MCO § 139.20 (2017).  Whether a landlord qualifies for an "undue hardship" defense is determined after a 270-day process, and the result applies to a single case.  A finding of

5

discrimination results in a civil penalty paid to the city and may result in compensatory and punitive damages paid to the aggrieved party and/or an order to rent the unit to the aggrieved party. MCO § 141.50(r) (2017).

Landlords may screen applicants as permitted by the applicable public-assistance housing program or other nondiscriminatory criteria. MCO § 139.30(c) (2017). Landlords participating in the HCV program also have access to a landlord incentive fund, which permits landlords to request a $500-2,500 reimbursement for damage to property in excess of a security deposit.

### *This Action*

In June 2017, Fletcher filed a complaint against the city seeking declaratory and injunctive relief and alleging five counts: (1) the ordinance is preempted by state law; (2) the ordinance violates due process in violation of the Minnesota Constitution (due-process claim); (3) the ordinance constitutes a taking under the Minnesota Constitution (takings claim); (4) the ordinance is an unlawful interference with freedom of contract (freedom-of-contract claim); and (5) the ordinance violates equal-protection rights under the Minnesota Constitution (equal-protection claim).

Upon cross-motions for summary judgment, the district court granted Fletcher's motion and denied the city's motion on the basis that the ordinance violates due-process and equal-protection rights under the Minnesota Constitution. The district court enjoined the city from enforcing portions of the ordinance and found the remainder of Fletcher's claims moot.

6

The city appealed the decision, and Fletcher cross-appealed. We reversed the district court's ruling on Fletcher's due-process and equal-protection claims, and the supreme court affirmed. *Fletcher Props., Inc. v. City of Minneapolis*, 947 N.W.2d 1 (Minn. 2020); *Fletcher Props., Inc. v. City of Minneapolis*, 931 N.W.2d 410 (Minn. App. 2019). On remand, the district court dissolved the permanent injunction and issued a temporary injunction.

In August 2022, the city renewed its motion for summary judgment on the remaining claims: the takings claim, the preemption claim, and the freedom-of-contract claim. Fletcher opposed the city's motion and cross-moved for summary judgment on its takings and preemption claims. It asked the district court to dismiss its freedom-of-contract claim.

Housing Justice Center (HJC), Poverty & Race Research Action Council (PRRAC), and HOME Line (collectively, amici) each moved the district court for leave to file amicus briefs. Following a hearing on the motions for summary judgment and motions for leave, the district court granted the motions for leave and considered the amici submissions. The district court thereafter granted the city's motion for summary judgment, denied Fletcher's motion for summary judgment, and dissolved the temporary injunction.

Fletcher appeals the district court's summary-judgment decision and its ruling allowing amici participation.[2]

---

[2] The amici are respondents on appeal with respect to Fletcher's challenge to the district court's orders permitting their participation.

7

**ISSUES**

I.      Did the district court err by determining that the ordinance on its face does not amount to a taking?

II.     Did the district court err by determining that the ordinance is not preempted by state law?

III.    Did the district court abuse its discretion by granting the amici leave to participate in the summary-judgment proceedings?

**ANALYSIS**

Fletcher argues that the district court erred as a matter of law in granting summary judgment to the city because (1) on its face, the ordinance constitutes a per se physical taking under the Minnesota Constitution; (2) on its face, the ordinance constitutes a regulatory taking under the Minnesota Constitution; (3) the ordinance conflicts with the Minnesota Human Rights Act (MHRA), Minn. Stat. §§ 363A.001-363A.50 (2022)[3] and is therefore preempted; and (4) the MHRA occupies the field of addressing housing discrimination based on public assistance. Fletcher also argues that the district court abused its discretion in allowing amici participation.

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Minn. R. Civ. P. 56.01. When reviewing a summary-judgment ruling, "we review [de novo] whether there are any genuine issues of material fact and whether the district court erred in its application of the law." *STAR Ctrs., Inc. v. Faegre & Benson, L.L.P.*, 644 N.W.2d 72, 76-77 (Minn. 2002).

---

[3] The MHRA was amended in 2023 to, among other things, modify the definitions of protected classes under the statute. 2023 Minn. Laws ch. 52, arts. 3, § 3, at 679-80, 19, §§ 45-72, at 920-31. The amendments do not impact our analysis in this opinion.

8

Because the district court granted summary judgment in favor of the city, we view the facts in the light most favorable to Fletcher and draw all reasonable inferences from those facts in favor of Fletcher. *See Wensmann Realty, Inc. v. City of Eagan*, 734 N.W.2d 623, 630 (Minn. 2007) ("Because the district court granted summary judgment in favor of the [respondent], we must view the evidence in the light most favorable to . . . the party against whom summary judgment was granted."). We address each of Fletcher's arguments in turn.

## I.     The ordinance on its face does not effect a taking.

Fletcher argues that the district court erred in determining that its takings claim fails as a matter of law. Fletcher specifically asserts that, on its face, the ordinance is a per se physical taking under the Minnesota Constitution, or alternatively, it effects a regulatory taking under the Minnesota Constitution.[4] We address each argument in turn.

The Minnesota Constitution provides that "[p]rivate property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured."[5] Minn. Const. art. 1, § 13. "The purpose of the Takings Clause is to ensure that

---

[4]   Fletcher does not assert that, as applied, the ordinance effects a taking under the Minnesota Constitution. As such, our decision is limited to the determination of whether, on its face, the ordinance effects a taking under the Minnesota Constitution.

[5]   The United States Constitution provides "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Because the Takings Clause of the United States Constitution is similar to the Takings Clause of the Minnesota Constitution, Minnesota courts may look to caselaw analyzing a takings claim under the United States Constitution in evaluating a takings claim arising under the Minnesota Constitution. *Wensmann*, 734 N.W.2d at 632-33. Fletcher does not argue that the ordinance is a taking under the United States Constitution.

9

the government does not require some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Wensmann*, 734 N.W.2d at 632 (quotation omitted). A taking may occur when the government directly appropriates or physically invades property—known as a physical taking—or when a government regulation unfairly diminishes the value of an owner's property—known as a regulatory taking. *See id.* (describing regulatory takings); *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071-72 (2021) (describing physical takings); *Yee v. City of Escondido*, 503 U.S. 519, 527-28 (1992) (describing physical takings). We presume that an ordinance is constitutional, and Fletcher bears the burden of showing that the ordinance is unconstitutional. *Minn. Voters All. v. City of Minneapolis*, 766 N.W.2d 683, 688 (Minn. 2009).

To succeed in its challenge to the ordinance on its face, Fletcher must show that the ordinance effects a taking in all applications. *Id.* A facial challenge to a law cannot succeed when the alleged harm may or may not occur. *See id.* at 696 (reasoning that claims that a voting system was unconstitutional based on reallocation of surplus votes in a multi-seat election and its "non-monotonic" nature failed in part because the claims were based on hypothetical situations where the alleged harm may or may not occur).

Against this backdrop, we consider Fletcher's challenge to the ordinance on its face as a per se physical taking or, alternatively, as a regulatory taking.

### A.    The ordinance on its face is not a per se physical taking.

Fletcher argues that the ordinance constitutes a per se physical taking on its face because the ordinance requires landlords to let to tenants whom they would otherwise

10

exclude and permits the physical invasion of a landlord's property by way of certain features of the HCV program—specifically, default one-year initial-lease terms under the HAP contract, restrictions on termination of tenancy by the owner under the tenancy addendum, and housing-quality-standards inspections. We disagree.

The "essential question" in determining whether a taking is physical or regulatory in nature is "whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." *Cedar Point Nursery*, 141 S. Ct. at 2072. If a regulation results in physical appropriation of property, the regulation is a physical taking and regulatory-taking analysis does not apply. *Id.* "Limitations on how a business generally open to the public may treat individuals on the premises are readily distinguishable from regulations granting a right to invade property closed to the public" and "government health and safety inspection regimes will generally not constitute takings." *Id.* at 2077, 2079. "When a landowner decides to rent his land to tenants, the government may . . . require the landowner to accept tenants he does not like . . . without automatically having to pay compensation." *Yee*, 503 U.S. at 529 (citations omitted).

Fletcher argues that the ordinance constitutes a per se physical taking because it "appropriates for the enjoyment of third parties the owners' right to exclude." *Cedar Point Nursery*, 141 S. Ct. at 2072. It compares the ordinance to the circumstances in *Cedar Point Nursery*, in which the Supreme Court determined that a regulation permitting union organizers to enter property otherwise closed to the public was a per se physical taking. *Id.*

11

at 2080. We do not agree that the circumstances here are similar to those in *Cedar Point Nursery*.

Rather, the circumstances here are similar to those in *Yee*, in which a municipality imposed regulations on landlords, who had already chosen to let their property, requiring them to accept certain tenants. 503 U.S. at 526-29, 531. In *Yee*, the Supreme Court rejected the argument that such regulation effected the "unwanted physical occupation of land" because it "deprive[d] petitioners of the ability to choose their incoming tenants." *Id.* at 530-31. The Court wrote, "Because they voluntarily open their property to occupation by others, petitioners cannot assert a *per se* right to compensation based on their inability to exclude particular individuals." *Id.* at 531 (citing *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 261 (1964); *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 82-84 (1980)). Like the circumstances in *Yee*, the ordinance does not appropriate a landlord's right to exclude others for a use not contemplated by the landlord. The landlords have already chosen to let their premises; the ordinance simply imposes restrictions on how they may do so. Because Fletcher has already chosen to let property to tenants, the government may regulate Fletcher's ability to exclude incoming tenants without effecting a per se physical taking.

Moreover, we see no principled reason to adopt Fletcher's suggestion that Minnesota courts not accept or apply the holding in *Yee*.[6] Fletcher does not argue that the

---

[6] Fletcher asks us to reject *Yee* in part because two panels of the Eighth Circuit have recently declined to apply *Yee*. *See Heights Apartments, LLC v. Walz*, 30 F.4th 720, 733 (8th Cir. 2022) (reasoning that *Cedar Point Nursery* was instructive in analyzing whether executive orders issued during the COVID-19 pandemic that prohibited a landlord from

holding in *Yee* contravenes the Minnesota Constitution. And the holding in *Yee*, that the government does not necessarily effect a taking by regulating a landlord's existing business, is consistent with Minnesota's anti-discrimination laws and comprehensive landlord-tenant statutory scheme that includes restrictions on a landlord's ability to exclude tenants from their property. *See, e.g.*, Minn. Stat. §§ 504B.291 (permitting tenant who has failed to pay rent to redeem tenancy by paying amount in arrears and other costs), .441 (prohibiting landlord from evicting tenant as a penalty for good-faith complaint of a violation) (2022).

We are also unpersuaded by Fletcher's assertion that the housing-quality-standards inspections are a physical invasion of property such that the ordinance is a physical taking in all applications. *Cedar Point Nursery* specifically acknowledged that "the government may require property owners to cede a right of access as a condition of receiving certain benefits, without causing a taking" and therefore "government health and safety inspection

---

evicting a tenant constituted a taking and determining that plaintiffs' per se physical-takings claim was sufficient to survive a motion to dismiss); *301, 712, 2103, and 3151, LLC v. City of Minneapolis*, 27 F.4th 1377, 1383 (8th Cir. 2022) (declining to apply *Yee* on the basis that, since the Supreme Court's decision in *Horne v. Dep't of Agric.*, 576 U.S. 350 (2015), the Eighth Circuit had cited *Horne* and not *Yee*, reasoning that "an ordinance that would require landlords to rent to individuals they would otherwise reject *might* be a physical-invasion taking" (emphasis added)). First, these decisions are not binding on Minnesota courts. Second, the United States Supreme Court has not overruled *Yee*, and it cited *Yee* in *Cedar Point Nursery*. *Cedar Point Nursery*, 141 S. Ct. at 2072. Third, we see no basis upon which we would conclude that *Yee* is no longer good law in light of *Cedar Point Nursery*. *See Heights Apartments*, 30 F.4th at 733 (distinguishing *Yee* on the basis that the "landlords in *Yee* sought to exclude future or incoming tenants, rather than existing tenants"). We therefore see no reason to disregard existing United States Supreme Court precedent. And to the extent Fletcher cites to *Horne* as support for its regulatory taking argument, *Horne* is inapposite because the decision did not analyze whether a regulatory taking occurred.

regimes will generally not constitute takings." 141 S. Ct. at 2079-80 (concluding that "unlike standard health and safety inspections," the regulation at issue was "not germane to any benefit provided to agricultural employers or any risk posed to the public"). That the ordinance allows the government access to a landlord's property to conduct an inspection is not, on its face, the type of property appropriation giving rise to a per se physical taking in every application.[7]

We therefore hold that, on its face, MCO § 139.40(e)(1) does not appropriate private property or a landlord's right to exclude others from private property, and therefore does not constitute a per se physical taking in all applications.

### B. On its face, the ordinance is not a regulatory taking.

Fletcher also argues that the ordinance on its face constitutes a regulatory taking. "In limited circumstances, government regulation of property may result in a taking." *Wensmann*, 734 N.W.2d at 632. In considering whether a regulation constitutes a taking, we seek to determine whether "justice and fairness require that economic injuries caused by public action be compensated by the government" by balancing three factors: the economic impact of the regulation, interference with investment-backed expectations, and the character of the governmental action. *Id.* at 633-42 (applying factors as set forth in

---

[7] We likewise cannot conclude that the inspection process will effect a taking in all applications. Fletcher points to a procedure requiring that rental units be vacant pending a housing-quality-standards inspection as a taking, but no taking would occur for an already vacant unit. Fletcher also points to a procedure requiring that a unit failing an inspection must remain vacant until the unit passes inspection as amounting to a taking, but such a procedure would not affect those units that have passed inspection. Fletcher does not argue that these procedures amount to a regulatory taking.

*Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)). Our inquiry is "highly" fact specific and focuses "on the severity of the burden that government imposes on private property rights." *Id.* at 632-33 (quotation omitted).

### *Economic Impact*

Fletcher argues that the ordinance will cause a negative economic impact by increasing landlords' operating expenses and capitalization rates. But Fletcher cannot establish that the ordinance will result in a negative economic impact in all applications.

First, the ordinance itself includes a procedure by which a landlord may be excepted from letting to a tenant for economic reasons. The ordinance affords landlords the ability to assert an undue-hardship affirmative defense to a discrimination claim. MCO § 139.40(e)(1). The determination of whether an undue hardship exists involves the consideration of individualized factors including the "nature and net cost of complying with any requirement of a public assistance program." MCO § 139.20. If a landlord successfully asserts the affirmative defense, that landlord is not required to accept a tenant. In that instance, the ordinance may not result in a negative economic impact based on compliance with the ordinance. This possibility is fatal to Fletcher's challenge to the ordinance on its face. Although Fletcher complains about the potential costs of asserting such an affirmative defense and the purported stigma associated with a discrimination claim, it offers no legal authority to support a conclusion that these possibilities render the ordinance a regulatory taking in all applications.

Second, the record evidence does not establish that the ordinance will cause a negative economic impact in all applications. Fletcher cites to 2018 and 2022 impact

studies, both of which conclude that the degree of impact that the ordinance will have on operating expenses "will vary depending on the specific property." The record does not establish that in every instance a negative economic impact will occur.

Because Fletcher failed to carry the burden of establishing that the ordinance will result in a negative economic impact in all applications, this factor does not weigh in favor of concluding that the ordinance on its face constitutes a regulatory taking.

### Interference With Investment-Backed Expectations

Fletcher next argues that the ordinance interferes with its investment-backed expectations because landlords were not previously required to participate in the HCV program, the HCV program diminishes landlords' property values, and the HCV program restricts landlords' ability to dispose of their property.

"In examining a property owner's investment-backed expectations, the existing and permitted uses of the property when the land was acquired generally constitute the primary expectation of the landowner regarding the property." *Wensmann*, 734 N.W.2d at 637 (quotation omitted). We acknowledge that Minneapolis landlords were not required to participate in the HCV program before enactment of the ordinance. *See Edwards v. Hopkins Plaza Ltd. P'ship*, 783 N.W.2d 171, 175-79 (Minn. App. 2010) (reasoning that the MHRA did not require a landlord to continuing renting to an HCV holder when termination was supported by legitimate business reasons). But the enactment of the ordinance does not alter the ability to rent property, the primary expectation of the landowner regarding the property. *See Zeman v. City of Minneapolis*, 552 N.W.2d 548, 553-54 (Minn. 1996) (reasoning that license revocation interfered with landlord's

16

investment-backed expectations when he had been operating his property as a rental dwelling for over 15 years). Under the ordinance, landowners intending to use their property as rental property are still able to do so.

Although Fletcher argues that the ordinance imposes burdens on an owner's ability to dispose of their property—and we acknowledge that an active HAP contract imposes additional burdens on the sale of a rental property—Fletcher cites no authority concluding that such burdens establish a regulatory taking in all applications. Under the HAP contract, the MPHA must consent to the sale of the property and a new owner must agree to take the property subject to the HAP contract. But we note that the HAP contract also limits the circumstances in which the MPHA may reject a proposed sale.

Because the ordinance does not impede a landlord's choice to continue renting their property, and because requiring MPHA's consent to the sale of the property subject to the HAP contract does not necessarily amount to interference with investment-backed expectations, we are not persuaded that this factor weighs in favor of concluding that the ordinance constitutes a regulatory taking.

### *Character of Governmental Action*

Fletcher argues that the character of governmental action results in a taking because the ordinance imposes a burden on a small group of landlords to house HCV holders. But whether a property owner must participate in the program in the future is uncertain, and therefore, it is unclear who will bear the burden of the ordinance. We therefore cannot say that this factor weighs in favor of concluding that the ordinance constitutes a regulatory taking. *See Wensmann*, 734 N.W.2d at 640 (reasoning that this factor weighed in favor of

17

a taking because only a few owners were subject to the land-use designation and the owner was asking to use their land in a way that others were permitted to in the past, and those permissions were now making it harder for the owner to obtain the designation that they sought).

We therefore cannot say that the ordinance on its face constitutes a taking in all applications. The district court therefore did not err in granting summary judgment dismissing Fletcher's facial challenge to the ordinance as a regulatory taking.[8]

## II. The ordinance is not preempted by state law.

Fletcher argues that the ordinance is preempted by state law and is therefore unenforceable. "There are three types of state preemption of municipal legislative authority: express preemption, conflict preemption, and field preemption." *Minn. Chamber of Com. v. City of Minneapolis*, 944 N.W.2d 441, 447 (Minn. 2020) (quotation omitted). Fletcher argues that the ordinance conflicts with the MHRA and that the MHRA occupies the field of preventing housing discrimination on the basis of public assistance in Minnesota. We disagree and address each argument in turn.

### A. The ordinance does not conflict with the MHRA.

Fletcher argues that the ordinance conflicts with the MHRA because (1) the MHRA conveys a right not to participate in the HCV program, but the ordinance requires participation; (2) the ordinance obstructs the purposes of the MHRA because it permits

---

[8] Fletcher also argues that the ordinance is an unconstitutional taking because it does not take property for public use, reasoning that the beneficiaries of the ordinance are HCV holders rather than the public as a whole. Because we conclude that Fletcher did not establish that the ordinance on its face effects a taking, we do not reach this argument.

unfounded charges of discrimination and the MHRA protects against such unfounded charges; and (3) the ordinance frustrates rather than complements the MHRA by redefining discrimination.

An ordinance may be preempted if it conflicts with state law. *Id.* "[C]onflicts which would render an ordinance invalid exist only when both the ordinance and the statute contain express or implied terms that are irreconcilable with each other." *Id.* (quotation omitted). More specifically, a conflict may exist when "the ordinance permits what the statute forbids" or "the ordinance forbids what the statute *expressly* permits." *Id.* (quotation omitted). But "no conflict exists where the ordinance, though different, is merely additional and complementary to or in aid and furtherance of the statute." *Id.* (quotation omitted).

First, the ordinance does not forbid what the MHRA expressly permits. The MHRA does not expressly permit an owner to refuse to participate in Section 8 housing. *See* Minn. Stat. §§ 363A.09 (making it an "unfair discriminatory practice" to refuse to lease to a person because of their status with regard to public assistance), .21 (setting forth exemptions based on real property).

We disagree with Fletcher's reliance on *Edwards* to support its argument that the MHRA permits landlords to refuse to participate in Section 8 housing and refuse to let to HCV holders. In *Edwards*, we concluded that the MHRA "does not require property owners in Minnesota to participate in Section 8 programs," that "refusal to participate in a voluntary program for a legitimate business reason does not constitute discrimination under the [MHRA]," and that "refusal to renew a lease because of a decision to discontinue

19

participation in a voluntary housing program is not a refusal to rent because of status with regard to public assistance." 783 N.W.2d at 177-78. But a conclusion that the MHRA *does not require participation* in Section 8 housing is distinct from a conclusion that the MHRA *grants a right not to participate* in Section 8 housing. *See Minn. Chamber*, 944 N.W.2d. at 447 (rejecting an argument that there was an irreconcilable conflict between a municipal regulation and state law based on implied statutory permission).

Second, the ordinance does not permit action that the MHRA forbids. Fletcher argues that the ordinance permits unfounded charges of discrimination because it includes as an "unlawful discriminatory practice" the act of refusing to let to a person because of the requirements of a public-assistance program, MCO § 139.40(e)(1), and the express purpose of the MHRA includes "protect[ing] all persons from wholly unfounded charges of discrimination." Minn. Stat. § 363A.02, subd. 1(b). But a claim that a landlord was motivated not to rent to a person based on the requirements of a public-assistance program is not necessarily a "wholly unfounded" claim of discrimination under the MHRA.

Third, the ordinance does not frustrate the purposes of the MHRA and is merely complementary to the MHRA. In Fletcher's prior appeal, the supreme court explained that the ordinance "expands" the list of prohibited reasons for refusing to rent property set forth in the MHRA. *Fletcher*, 947 N.W.2d at 16. And Fletcher's assertion that the ordinance "liken[s] refusal to participate in a program for legitimate business reasons to discriminate against a person" is incongruous with the fact that the ordinance provides an affirmative defense for undue hardship. MCO §§ 139.20, .40(e)(1). We therefore conclude that the ordinance does not conflict with the MHRA.

20

**B.     The MHRA does not occupy the field.**

Fletcher argues that the MHRA occupies the field of preventing housing discrimination and the ordinance is therefore preempted.  Specifically, Fletcher argues that the exclusivity provision of the MHRA shows the legislature's intent to occupy the field of housing discrimination and the local ordinance would have unreasonable adverse effects on Minnesota citizens.

In determining whether state law impliedly preempts an ordinance by occupying the field, we consider four factors, known as the *Mangold* factors:

> (1) What is the "subject matter" which is to be regulated?
>
> (2) Has the subject matter been so fully covered by state law as to have become solely a matter of state concern?
>
> (3) Has the legislature in partially regulating the subject matter indicated that it is a matter solely of state concern?
>
> (4) Is the subject matter itself of such a nature that local regulation would have unreasonably adverse effects upon the general populace of the state?

*Minn. Chamber*, 944 N.W.2d at 449 (quoting *Mangold Midwest Co. v. Village of Richfield*, 143 N.W.2d 813, 820 (Minn. 1966)); *see also Graco, Inc. v. City of Minneapolis*, 937 N.W.2d 756, 764-66 (Minn. 2020) (referencing the factors as the *Mangold* factors).

The first *Mangold* factor is the subject matter to be regulated.  *Minn. Chamber*, 944 N.W.2d at 449.  "In identifying the subject matter, we look first to the *relevant state statute* to determine what the Legislature intended to regulate." *Jennissen v. City of Bloomington*, 913 N.W.2d 456, 460 (Minn. 2018) (emphasis added).  Before the district court, the parties agreed that the subject matter is "discrimination in housing based on status of public

21

assistance."  Accordingly, we will consider the relevant subject matter to be housing discrimination based on public assistance.

The second *Mangold* factor is whether housing discrimination based on public assistance has been so fully covered by state law that it is solely a matter of state concern. *Minn. Chamber*, 944 N.W.2d at 449.  In considering this factor, we look to "statements of purpose" or the "uniform and comprehensive character of the statutory scheme."  *Id.* at 450.  Fletcher does not directly address this factor in its brief to this court.  Fletcher cites the "public policy" provision of the MHRA, which provides that "[i]t is the public policy of this state to secure for persons in this state, freedom from discrimination . . . in housing and real property because of race, color, creed, religion, national origin, sex, marital status, disability, status with regard to public assistance, sexual orientation, and familial status."  Minn. Stat. § 363A.02, subd. 1(a)(2).  But nothing in the public-policy provision indicates that the legislature intended to fully cover housing discrimination based on public assistance or indicates that it is solely a matter of state concern.  Fletcher also seems to assert that the existence of state regulation alone shows that the city's "encroachment on this area" is preempted by state law.  We are not persuaded that the mere existence of the MHRA necessitates a conclusion that it is a comprehensive statutory scheme covering discrimination in housing based on public assistance.

The third *Mangold* factor is whether the legislature, in partially regulating housing discrimination based on public assistance, indicated that it is a matter solely of state concern.  *Minn. Chamber*, 944 N.W.2d at 449.  We evaluate this factor by looking to the plain language of the statute to determine whether the subject matter is solely of state

22

concern. *Id.* at 451. "[W]e require clear language expressing a legislative intent to exclude municipal activity." *Graco*, 937 N.W.2d at 765. Here, Fletcher points to the "construction and exclusivity" provision of the MHRA, Minn. Stat. § 363A.04, which we refer to as the "exclusivity provision" of the MHRA. *See Abel v. Abbott Nw. Hosp.,* 947 N.W.2d 58, 80 (Minn. 2020) (referring to this provision of the MHRA as the "exclusivity provision").

The exclusivity provision provides that the MHRA shall be "construed liberally" to accomplish its purposes, shall not be deemed to "repeal any provisions of the civil rights law or laws of Minnesota related to discrimination" against protected classes, and unambiguously provides that, for "acts declared unfair" under sections 363A.08 to 363A.19 and 363A.28, the procedures set forth in the MHRA "shall, while pending, be exclusive." Minn. Stat. § 363A.04. Consistent with its plain language, the supreme court recently confirmed that the exclusivity provision "applies *only* where a Human Rights Act claim is 'pending' and *only* 'as to acts declared unfair'" by the statute. *Abel*, 947 N.W.2d at 80 (emphasis added) (quoting Minn. Stat. § 363A.04 (2018)) (concluding that until a determination is made that the MHRA covered the claims at issue, the exclusivity provision had no application). There is no MHRA claim pending here. Even so, we note that the exclusivity provision has only been interpreted as limiting remedies, not municipal activity. *Cf. Abel*, 947 N.W.2d at 80; *Williams v. St. Paul Ramsey Med. Ctr., Inc.*, 551 N.W.2d 483, 486 (Minn. 1996) (concluding that the exclusivity provision in the MHRA preempted a separate claim under Minnesota's whistleblower act based on the same alleged discriminatory practice and facts). We are not persuaded that the legislature, in partially

23

regulating housing discrimination based on public assistance, indicated that this subject matter is solely of state concern.

The fourth *Mangold* factor is whether housing discrimination based on public assistance is "of such a nature that local regulation would have unreasonably adverse effects upon the general populace of the state[.]" *Minn. Chamber*, 944 N.W.2d at 449 (quotation omitted). We are not persuaded that local ordinances addressing housing discrimination based on public assistance will have an unreasonably adverse effect on the general populace of the state. Fletcher asserts that Minnesota citizens will be harmed by differing definitions of discrimination and the ordinance will "adversely affect the entire population of Minneapolis" because it will cause developers to make choices to avoid participation in the HCV program. These arguments do not establish that "the *state at large* would suffer because of local regulation." *Id.* at 452. And we note that "it is not enough for a business to show that it will be subject to different regulations in different cities by way of local ordinances." *Id.* Fletcher's arguments fail to establish that local ordinances addressing housing discrimination based on public assistance cannot exist without resulting in a "problematic patchwork" of regulation such that the MHRA must preempt local regulation. "If the Legislature determines that municipal regulation is creating economic confusion, the problem can be corrected by a clear expression of the legislative will." *Graco*, 937 N.W.2d at 766 (quotation omitted).

We therefore conclude the MHRA does not occupy the field of addressing housing discrimination based on public assistance.

**III.** **The district court did not abuse its discretion by granting the amici leave to participate at summary judgment.**

Fletcher argues that the district court abused its discretion by granting the amici leave to file memoranda after the parties briefed and argued summary judgment. We are not persuaded that the district court abused its discretion.

The purpose of amici briefing in a civil action is "to inform the court as to facts or situations which may have escaped consideration or to remind the court of legal matters which have escaped its notice and regarding which it appears to be in danger of making a wrong interpretation." *State v. Finley*, 64 N.W.2d 769, 773 (Minn. 1954). We review a district court's decision to permit amici briefing for an abuse of discretion. *See id.* at 771 (framing issue on appeal as whether the trial court "abuse[d] its discretion" in permitting amici briefs).

Shortly after the city filed its renewed motion for summary judgment, the amici filed motions for leave to file submissions, attaching substantive memoranda setting forth their respective arguments on the issues before the district court. Fletcher opposed the amici motions. At the beginning of the summary-judgment hearing, the district court heard arguments on the amici motions, specifically inquiring of Fletcher whether it would be prejudiced by amici participation. Counsel for Fletcher claimed that it would be prejudiced because it would be required to respond to the amici memoranda. The district court was unpersuaded that Fletcher would be prejudiced, granted the amici leave to participate, and considered the amici memoranda. We see no abuse of discretion in the district court's determination that Fletcher would not be prejudiced by the amici participation.

25

**DECISION**

We hold that, on its face, MCO § 139.40(e)(1) does not appropriate private property or a landlord's right to exclude others from private property, and therefore does not constitute a per se physical taking in all applications. We also conclude that the facial regulatory-taking claim fails as a matter of law because Fletcher did not establish that the ordinance will result in an unfair diminution of property value in all applications. We also hold that MCO § 139.40(e)(1) is not preempted by the MHRA, as it does not conflict with the MHRA, and the MHRA does not occupy the field of addressing housing discrimination based on public assistance. And the district court did not abuse its discretion in allowing amici participation. We therefore affirm the district court in all respects.

**Affirmed.**